YALE AVENUE CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

FORTY-FIRST STREET CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 7500–70, 7501–70. Filed September 28, 1972.

*Paul R. Hodgson*, for the petitioners.
*Thomas J. Miller*, for the respondent.

FORRESTER, *Judge:* For their taxable years ended July 31, 1967, respondent has determined deficiencies in petitioners' income taxes of $7,312.65 in docket No. 7500–70 and $2,206.98 in docket No. 7501–70. He has also determined additions to those taxes under section 6651(a) [1] in the amounts of $1,828.16 in docket No. 7500–70 and $551.74 in docket No. 7501–70. The issues for our decision are whether petitioners realized income from certain discharges of their indebtedness and whether petitioners' failure to file timely income tax returns was due to reasonable cause and not due to willful neglect.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation and exhibits attached thereto are incorporated herein by this reference.

At the times of the filings of the respective petitions herein both petitioners had their principal places of business in Tulsa, Okla. Petitioner Yale Avenue Corp. (hereinafter referred to as Yale) filed its corporation income tax return for its taxable year ending July 31, 1967, with the district director of internal revenue in Oklahoma City, Okla., on February 18, 1969. Petitioner Forty-First Street Corp. (hereinafter referred to as Forty-First) filed its corporation income tax return for its taxable year ending July 31, 1967, with the district director of internal revenue in Oklahoma City., Okla., on March 6, 1969.

Both petitioners were organized under the laws of Oklahoma and were each authorized by their respective articles of incorporation to issue 100 shares of common stock of par value of $100 per share.

Yale was organized on or about August 21, 1954, by Max W. and Tookah S. Campbell (husband and wife and hereinafter referred to as Max and Tookah) for the sole purpose of platting, developing, and subdividing a 44.3-acre land tract (hereinafter referred to as the Yale

[1] Unless otherwise specified all statutory references are to the Internal Revenue Code of 1954.

tract) located in then section 27, T. 19 N., R. 13 E., Tulsa County, Okla. On September 15, 1954, at the first meeting of Yale's incorporators, stockholders, and subscribers, Max and Tookah offered to convey the Yale tract to Yale in exchange for all of Yale's authorized capital stock and a note secured by a first real estate mortgage as might be agreed upon by Yale's directors. The income tax basis of Max and Tookah in the Yale tract was $10,334.30. Yale's incorporators, stockholders, and subscribers then authorized and directed Yale's board of directors to accept the offer. On the same day at the first meeting of Yale's board of directors, Yale's directors resolved that the Yale tract had a reasonable value of $177,200 and decided to accept the offer of Max and Tookah.

Thus, on September 15, 1954, pursuant to these minutes Max and Tookah conveyed the Yale tract to Yale by a general warranty deed and in return Yale issued to Max and Tookah a promissory note for $167,200 and, as security for the note, a real estate mortgage on the Yale tract. The promissory note provided in pertinent part as follows:

Three years after date, for value received, the undersigned, Yale Avenue Corporation, an Oklahoma Corporation, promises to pay to the order of Max W. Campbell and Tookah S. Campbell the sum of $167,200.00 negotiable and payable at the office of the Fourth National Bank of Tulsa, Oklahoma, with interest from date at the rate of 3% per annum, payable annually.

Pursuant to the directions of Max and Tookah during these organizational transactions all of Yale's authorized capital stock was issued as follows:

|  | Shares |
|---|---|
| Max | 49 |
| Tookah | 49 |
| John H. Poe | 2 |

John H. Poe was a lawyer who had helped to organize Yale.

These organizational transactions were reflected in the opening entry of Yale's books as follows:

| Land | $177,200 | |
|---|---|---|
| Note payable | | $167,200 |
| Capital stock | | 10,000 |

Forty-First was organized by Max and Tookah on or about August 21, 1954, for the sole purpose of platting, developing, and subdividing a 22.256-acre land tract (hereinafter referred to as the Forty-First tract) located in then section 27, T. 19 N., R. 13 E., Tulsa County, Okla. On January 14, 1955, at the first meeting of Forty-First's incorporators and stockholders, Max and Tookah offered to convey the Forty-First tract to Forty-First in exchange for 50 shares of Forty-

First's capital stock and $84,024 in cash.[2] Forty-First's incorporators and stockholders then authorized and directed Forty-First's board of directors to accept this offer. On the same day at the first meeting of Forty-First's board of directors, Forty-First's directors resolved that the Forty-First tract had a reasonable value of $89,024 and decided to accept the offer of Max and Tookah.

Thus on March 8, 1955, Max and Tookah conveyed the Forty-First tract to Forty-First by a general warranty deed. Forty-First had prepared with respect to the Forty-First tract a note and a real estate mortgage very similar in form to the same instruments which Yale had issued with respect to the Yale tract. However, Forty-First did not issue either of the instruments it had prepared.

Pursuant to the directions of Max and Tookah, all of Forty-First's authorized capital stock was issued as follows:

|  | Shares |
|---|---|
| Max | 49 |
| Tookah | 49 |
| R. M. Darnell | 2 |

R. M. Darnell was a gentleman who had been the principal appraiser of the Yale tract.

Even though no note was issued to Max and Tookah with respect to the Forty-First tract, these organizational transactions were reflected in the opening entry of Forty-First's books as follows:

| Land | $89,024 | |
|---|---|---|
| Note payable | | $79,024 |
| Capital stock | | 10,000 |

During the periods when petitioners were operating corporations, their assets consisted of land (including development costs pertaining thereto), cash in the bank, and receivables.

Petitioners never deducted interest, nor did Max or Tookah include any interest in income for any payments relating to the notes men tioned above. Max never brought any legal action to enforce eithei Yale's obligation to him under the $167,200 note or Forty-First's obligations to him.

Petitioners proposed to liquidate their liabilities to Max from the proceeds anticipated from subdivision of the respective tracts into salable lots. The only way income could be derived from the lots was from their sale. Therefore, the payment of petitioners' obligations to Max was dependent upon the successful sale of the lots.

After having been organized, both petitioners had to borrow money in order to finance such development costs of subdivision as installation

---

[2] According to the minutes of this first meeting, Max and Tookah had already paid $5,000 for Forty-First's other 50 shares of capital stock.

of water and sewer facilities. Yale borrowed amounts from the Fourth National Bank of Tulsa and such amounts were repaid as follows:

| Borrowed | Amount | Repaid |
|---|---|---|
| October 1954 | $50,000 | November and December 1954. |
| January 1955 | 35,000 | March 1955. |
| March 1955 | 55,000 | April through October 1955. |
| April 1955 | 35,000 | November 1955. |
| November 1955 | 60,000 | December 1955 and August 1957. |
| January 1956 | 25,000 | August 1957. |

Forty-First borrowed amounts from the Fourth National Bank of Tulsa and such amounts were repaid as follows:

| Borrowed | Amount | Repaid |
|---|---|---|
| January 1955 | $5,000 | January 1955. |
| January 1955 | 20,000 | April and May 1955. |
| February 1955 | 5,000 | May 1955. |
| March 1955 | 5,000 | May 1955. |
| April 1955 | 70,000 | May, August, October, and November 1955. |
| June 1955 | 37,500 | November 1955. |
| November 1955 | 51,000 | August 1957. |

Tookah died on January 3, 1959. It has been stipulated that thereafter Max was the sole owner of both petitioners' outstanding stock.[3]

In a letter dated April 25, 1963, the district director in Oklahoma City, Okla., sent to Max, as executor of Tookah's estate, certain information with respect to Tookah's estate. The letter stated that Max had indicated agreement to the adjustment of a tax liability set forth in a report accompanying the letter. Accompanying the letter was a preliminary statement indicating that the estate's tax liability was $11,418.89. Also, as part of the explanation of adjustments accompanying the letter, the district director indicated that since "the net worth of the Companies as of date of death was nil" Tookah's stock in Yale and Forty-First was found to have no value.

In an Estate Tax Closing Letter (Form L–154 (6/63)) dated May 20, 1964, the district director of internal revenue in Oklahoma City, Okla., informed Max that the estate's Federal estate tax liability was $11,418.89.

In statutory notices of deficiency dated November 28, 1960, the Commissioner notified both Yale and Forty-First that he had determined deficiencies with respect to their taxable years 1955 through 1958. On February 23, 1961, Yale and Forty-First each filed a petition with this Court for a redetermination of the deficiencies for those

---

[3] It is not clear from the record at what point John H. Poe and R. M. Darnell disposed of their interests in Yale and Forty-First, respectively.

years. Yale's proceeding was docketed as No. 91279 and Forty-First's proceeding was docketed as No. 91278.

In the statutory notice of deficiency in docket No. 91278, respondent made the following determination· with respect to Forty-First:

It has been determined that the transaction on or about January 14, 1955 wherein you acquired 22.256 acres of land located in then Section 27, Township 19N., Range 13 E., Tulsa County, Oklahoma, from Max W. and Tookah S. Campbell constituted a nontaxable exchange of the land for capital stock under the provisions of section 351 of the 1954 Code. Accordingly, as provided in section 362, 1954 Code, the adjusted basis of such land in your hands has been reduced from $89,024.00 as claimed by you to $5,191.88, the transferors' basis.

In its petition in docket No. 91278, Forty-First averred that:

The Commissioner of Internal Revenue erred in determining that the transaction occurring on or about January 14, 1955, wherein petitioner acquired 22.256 acres of land located in Tulsa County, Oklahoma, from Max W. and Tookah S. Campbell, constituted a nontaxable exchange of the land for capital stock under the provisions of 351 of the 1954 Code.

Forty-First also averred that:

On or about January 14, 1955, petitioner purchased 22.256 acres of land located in Tulsa County, Oklahoma, from Max W. and Tookah S. Campbell, for an agreed consideration of $89,024.00 to be paid for by the petitioner by the issuance of 50 shares of its capital stock, having a par value of $100.00 per share, and payment of $84,024.00 in cash. The petitioners immediately prior to this transaction had the land appraised by expert real estate appraisers residing in Tulsa, Oklahoma, who found that the fair market value of said land on or about that date was in excess of $89,000.

On February 8, 1962, pursuant to agreements between the Commissioner and Yale and Forty-First, respectively, this Court entered stipulated decisions· with respect to docket Nos. 91279 and 91278. This Court entered a total deficiency of $57,367 in docket No. 91279 and a total deficiency of $9,360.83 in docket No. 91278.

Yale's agreement relating to the settlement upon which this Court's decision in docket No. 91279 was based provided in pertinent part as follows:

The petitioner has concurrently submitted a proposed settlement stipulation document whereunder its income tax liabilities for the taxable years ended July 31, 1955, 1956, 1957, and 1958 are to be settled on the basis of the following deficiencies and addition to tax:

| Year ended | Kind of tax | Deficiency | Addition to tax, sec. 6651(a), 1954 Code |
|---|---|---|---|
| 7/31/55 Income | | $36,176.61 | |
| 7/31/56 Income | | 15,595.44 | |
| 7/31/57 Income | | 1,166.43 | $58.32 |
| 7/31/58 Income | | 4,370.20 | |

In consideration of the Commissioner's acceptance of the above-described proposal of settlement the petitioner agrees that for Federal income tax purposes the adjusted cost basis in the hands of Yale Avenue Corporation of 44.3 acres of land located in then Section 27, Township 19 N. Range 13 E., Tulsa County, Oklahoma, at the time of its acquisition from Max W. and Tookah S. Campbell on or about September 15, 1954 was $10,334.30.

This agreement is conditioned on acceptance of the above-described proposal of settlement and if for any reason the case is not disposed of on such basis it shall be of no force or effect. If, however, the case is effectively disposed of on the described basis, the petitioner agrees on behalf of itself, its successors and assigns, that this document may be introduced in evidence without objection, in any proceeding involving tax liability to the Federal Government whether said proceeding is before the executive or the judicial branches of the Federal Government.

Forty-First's agreement relating to the settlement upon which this Court's decision in docket No. 91278 was based provided in pertinent part as follows:

The petitioner has concurrently submitted a proposed settlement stipulation document whereunder its income tax liabilities for the taxable years ended July 31, 1955, 1956, 1957, and 1958 are to be settled on the basis of the following deficiencies:

| Year ended | Kind of tax | Deficiency |
|---|---|---|
| July 31, 1955 | Income | $7,511.35 |
| July 31, 1956 | Income | 636.01 |
| July 31, 1957 | Income | 591.62 |
| July 31, 1958 | Income | 621.85 |

In consideration of the Commissioner's acceptance of the above-described proposal of settlement the petitioner agrees that for Federal income tax purposes the adjusted cost basis in the hands of Forty-First Street Corporation of 22.256 acres of land located in then Section 27, Township 19 N. Range 13 E., Tulsa County, Oklahoma, at the time of its acquisition from Max W. and Tookah S. Campbell on or about January 14, 1955, was $57,875.00.

This agreement is conditioned on acceptance of the above-described proposal of settlement and if for any reason the case is not disposed of on such basis it shall be of no force or effect. If, however, the case is effectively disposed of on the described basis, the petitioner agrees on behalf of itself, its successors and assigns, that this document may be introduced in evidence without objection, in any proceeding involving tax liability to the Federal Government whether said proceeding is before the executive or the judicial branches of the Federal Government.

On October 24, 1961, Max, individually and as executor of Tookah's estate, also entered into an agreement relating to the settlements upon which this Court's decisions in dockets Nos. 91278 and 91279 were based. That agreement provided in pertinent part as follows:

In consideration of the Commissioner's acceptance of the above-described proposals of settlement [in docket Nos. 91278 and 91279] the petitioners [Max and Tookah's estate] agree that the following tabulation reflects a correct analysis and application of funds withdrawn by them from, and/or repaid by them to,

Yale Avenue Corporation and Forty-First Street Corporation during the years 1954, 1955, 1956, and 1957:

| Year | Total net withdrawals (repayments) | Analysis and application | | | |
|---|---|---|---|---|---|
| | | Loans or (repayment of loans) | Commissions | Dividends | Payments on land |
| *Yale Avenue Corp.* | | | | | |
| 1954 | $40,400.00 | $30,140.00 | $2,432.50 | $7,867.50 | |
| 1955 | 49,726.67 | 29,336.83 | 9,770.79 | 10,619.05 | |
| 1956 | 69,545.77 | 49,865.22 | 2,770.13 | 16,910.42 | |
| 1957 | (52,885.00) | (57,570.00) | 0 | 4,685.00 | |
| Totals | 106,787.44 | 51,772.05 | 14,973.42 | 40,801.97 | None |
| *Forty-First Street Corp.* | | | | | |
| 1954 | | | | | |
| 1955 | 104,230.03 | 41,620.98 | 6,713.25 | 8,030.80 | 47,875 |
| 1956 | 3,637.63 | 0 | 590.00 | 3,047.63 | |
| 1957 | (33,179.63) | (34,109.63) | 930.00 | 0 | |
| Totals | 74,688.03 | 7,511.35 | 8,233.25 | 11,078.43 | 47,875 |

This agreement is conditioned on all three of the cases, T.C. Docket Nos. 91278, 91279, and 91280, being effectively disposed of on the bases described above and if for any reason the cases are not disposed of on such bases it shall be of no force or effect.[4] If, however, the cases are effectively disposed of on the described bases, the petitioners further agree on behalf of themselves, their successors and assigns, that this document may be introduced in evidence without objection in any proceeding involving tax liability to the Federal Government, whether said proceeding is before the executive or the judicial branches of the Federal Government.

Subsequent to this Court's decision in docket Nos. 91279 and 91278, respondent began to compute interest which was accruing upon those deficiencies. Thus, using the accrual method of accounting, one of respondent's examining agents allowed Yale and Forty-First deductions for interest accruing on the stipulated deficiencies determined by this Court in those decisions as follows:

For docket No. 91279:

| TYE July 31— | Interest deduction allowed | TYE July 31— | Interest deduction allowed |
|---|---|---|---|
| 1962 | $21,499.72 | 1965 | $3,442.02 |
| 1963 | 3,442.02 | 1966 | 3,442.02 |
| 1964 | 3,442.02 | | |
| | | Total | 35,267.80 |

---

[4] The case docketed as No. 91280 was a proceeding by Max and Tookah's estate for a redetermination of deficiencies for the taxable years 1954 through 1957. According to the agreement of Oct. 24, 1961, the Commissioner and petitioners in docket No. 91280 had reached an agreement on settlement of tax liabilities for the taxable years 1954, 1956, and 1957 thus limiting the purview of this Court's review of respondent's determination to the taxable year 1955. The parties have not informed us whether docket No. 91280 was "effectively disposed of on the bases described above." However, petitioners in the instant proceedings have not objected to introduction into evidence of the agreement of Oct. 24, 1961.

For docket No. 91278:

| TYE July 31— | Interest deduction allowed | TYE July 31— | Interest deduction allowed |
|---|---|---|---|
| 1962 | $3,594.67 | 1965 | $561.65 |
| 1963 | 561.65 | 1966 | 561.65 |
| 1964 | 561.65 | | |
| | | Total | 5,841.27 |

Neither Yale nor Forty-First had claimed any of this interest as deductions on their returns, nor had the interest so accrued been paid prior to August 1, 1966.

Eventually, the United States instituted a collection suit (civil No. 6034) in the U.S. District Court for the Northern District of Oklahoma for the collection of (1) the deficiencies determined by this Court in docket Nos. 91279 and 91278 and (2) interest which had accrued upon those deficiencies. After correspondence between petitioners and the United States, civil No. 6034 was settled. Upon petitioners' combined payment of $75,000 to the United States in settlement of civil No. 6034, the U.S. District Court for the Northern District of Oklahoma dismissed civil No. 6034 on January 31, 1967. Of the $75,000 paid in settlement of civil No. 6034, $64,427.02 was allocable to Yale's income tax liabilities and interest due on such liabilities and $10,572.98 was allocable to Forty-First's income tax liabilities and interest due on such liabilities.

Respondent determined that Yale had recognized $28,207.78 as income from the discharge of indebtedness for its taxable year 1967 as follows:

Stipulated total deficiency under this Court's decision in docket No. 91279 _____ $57,367.00
Accrued interest allowed as deduction_____ 35,267.80

Total obligation_____ 92,634.80
Less: Settlement with United States in civil No. 6034_____ 64,427.02

Discharge of indebtedness_____ 28,207.78

Respondent determined that Forty-First had recognized $4,629.12 as income from the discharge of indebtedness for its taxable year 1967 as follows:

Stipulated total deficiency under this Court's decision in docket No. 91278 _____ $9,360.83
Accrued interest allowed as deduction_____ 5,841.27

Total obligation_____ 15,202.10
Less: Settlement with United States in civil No. 6034_____ 10,572.98

Discharge of indebtedness_____ 4,629.12

Yale's balance sheets before and after settlement in civil No. 6034, as represented by Yale and as represented by respondent, were as follows:

| | Before settlement | | After settlement | |
|---|---|---|---|---|
| | Per Yale | Per respondent | Per Yale | Per respondent |
| *Assets* | | | | |
| Accounts receivable: | | | | |
| Max | 0 | $75,827.05 | 0 | $52,404.53 |
| Other | $41,237.11 | 41,237.11 | $232.61 | 232.61 |
| | 41,237.11 | 117,064.16 | 232.61 | 52,637.1 |
| *Liabilities* | | | | |
| Accounts payable: | | | | |
| Max | 91,372.95 | 0 | 114,795.47 | 0 |
| Other | 13,538.65 | 13,538.65 | 13,538.65 | 13,538.65 |
| Accrued tax and penalty | 57,367.00 | 57,367.00 | 0 | 0 |
| Accrued interest on tax and penalty | 35,267.80 | 35,267.80 | 0 | 0 |
| | 197,546.40 | 106,173.45 | 128,334.12 | 13,538.65 |
| Net worth | (156,309.29) | 10,890.71 | (128,101.51) | 39,098.49 |

Forty-First's balance sheets before and after settlement in civil No. 6034, as represented by Forty-First and as represented by respondent, were as follows:

| | Before settlement | | After settlement | |
|---|---|---|---|---|
| | Per Forty-First | Per respondent | Per Forty-First | Per respondent |
| *Assets* | | | | |
| Cash | $9.97 | $9.97 | $9.97 | $9.97 |
| Accounts receivable: | | | | |
| Max | 0 | 27,321.55 | 0 | 18,383.57 |
| Other | 13,610.59 | 13,610.59 | 11,975.59 | 11,975.59 |
| Tax refund due | 180.52 | 180.52 | 180.52 | 180.52 |
| | 13,801.08 | 41,122.63 | 12,166.08 | 30,549.65 |
| *Liabilities* | | | | |
| Accounts payable: | | | | |
| Max | 3,827.45 | 0 | 12,765.43 | 0 |
| Other | 247.00 | 247.00 | 247.00 | 247.00 |
| Accrued taxes and penalties | 9,684.04 | 9,684.04 | 323.21 | 323.21 |
| Accrued interest | 5,841.27 | 5,841.27 | 0 | 0 |
| | 19,599.76 | 15,772.31 | 13,335.64 | 570.21 |
| Net worth | (5,798.68) | 25,350.32 | (1,169.56) | 29,979.44 |

For their taxable years ended July 31, 1967, both Yale and Forty-First employed M. P. Bottenfield to prepare their income tax returns. None of petitioners' officers had any particular knowledge in the income tax field and they all relied on Bottenfield for the purpose of preparing tax returns. While Bottenfield had been engaged in an accounting practice since 1921, he was not a certified public accountant.

Bottenfield was not a permanent employee of petitioners nor did he receive a regular salary from them. However, he had done all of pe-

titioners' tax work for the here relevant years. In particular, Bottenfield kept petitioners' ledgers and filed their tax returns on the basis of information supplied to him. Aside from bookkeeping and tax advice, Bottenfield did not give any other type of advice to petitioners.

For the year in issue, Bottenfield advised petitioners that since they had no income it would be unnecessary to file income tax returns. When Bottenfield decided that petitioners did not have to file income tax returns he did not know about the settlement in civil No. 6034. Furthermore, Bottenfield was not aware in 1967 of any requirement or regulation that a corporation having no taxable income might still have to file an income tax return.

OPINION

In 1962 this Court entered stipulated decisions with respect to certain tax liabilities of both petitioners here. Subsequent to those decisions the United States began collection proceedings on those liabilities and on interest which had begun to accrue on those liabilities. After negotiations between petitioners and the United States, the collection proceedings were settled for a sum which was less than the total of the liabilities and accrued interest.

Thus, Yale, which had owed $57,367 on the originally stipulated liabilities and $35,267.80 on accrued interest, or a total of $92,634.80, paid only $64,327.02 in settlement. Similarly, Forty-First, which had owed $9,360.83 on the originally stipulated liabilities and $5,841.27 on accrued interest, or a total of $15,202.10, paid only $10,572.98 in settlement.

The parties are in agreement that to the extent the actual liabilities and interest exceeded the settlement, each petitioner received a discharge of indebtedness from the United States. The question before us is whether these discharges of indebtedness constituted gross income to petitioners.

Section 61(a)(12) provides that gross income includes income from the discharge of indebtedness. But not every discharge of indebtedness results in the realization of income. See sec. 1.61–12(a), Income Tax Regs. For example, the regulations provide that income is not realized by a taxpayer either by virtue of a discharge of a debt in bankruptcy or by virtue of a discharge of a debt through agreement among his creditors, if immediately after such discharges the taxpayer's liabilities exceed the value of his assets. Sec. 1.61–12(b)(1), Income Tax Regs.

The case law has extended the reasoning behind this regulation to situations not involving formal bankruptcies or composition arrangements. Thus, it has become well established that if a taxpayer is in-

solvent both before and after a discharge of his indebtedness, then that discharge does not result in a realization of gross income to him. *Dallas T. & T. Warehouse Co.* v. *Commissioner*, 70 F. 2d 95 (C.A. 5, 1934), reversing 27 B.T.A. 651 (1933); *Astoria Marine Construction Co.*, 12 T.C. 798 (1949); *Main Properties, Inc.*, 4 T.C. 364 (1944); *Madison Railways Co.*, 36 B.T.A. 1106 (1937); *Porte F. Quinn*, 31 B.T.A. 142 (1934); Rev. Rul. 58–600, 1958–2 C.B. 29.

In challenging respondent's determination that petitioners realized income from their respective discharges of indebtedness in 1967, petitioners contend that before and after such discharges both Yale and Forty-First were insolvent.[5] Respondent disputes this contention. Because resolution of this dispute requires different considerations for docket No. 7500–70 than for docket No. 7501–70, we shall discuss petitioners' cases separately.

In docket No. 7500–70, respondent argues that the 1954 transfer by Max and Tookah of the Yale tract to Yale constituted a contribution to capital in which event Yale would have been solvent both before and after the 1967 discharge of indebtedness. Petitioner, on the other hand, contends that the 1954 transfer of the Yale tract resulted in the creation of a bona fide debt of Yale to Max and Tookah in which event Yale would have been insolvent before and after such discharge. Thus, the precise question we must answer is whether the 1954 transfer resulted in the creation of a debt interest or an equity interest.

Whether a transfer of assets to a corporation by its dominant stockholders is a contribution to capital or constitutes the basis for the creation of a bona fide debt is a question of fact. E.g., *Diamond Bros. Co.* v. *Commissioner*, 322 F. 2d 725, 730 (C.A. 3, 1963), affirming a Memorandum Opinion of this Court; *Jewell Ridge Coal Corporation* v. *Commissioner*, 318 F. 2d 695, 698 (C.A. 4, 1963), affirming a Memorandum Opinion of this Court; *Gilbert* v. *Commissioner*, 262 F. 2d 512, 513 (C.A. 2, 1959), affirming a Memorandum Opinion of this Court, certiorari denied 359 U.S. 1002 (1959). In resolving this question the basic determination should be whether, as a matter of economic reality, the asset has been put at the risk of the corporate venture, thus representing an equity investment, or has been transferred with reasonable expectations of reimbursement regardless of the success of the business. *Gilbert* v. *Commissioner*, 248 F. 2d 399, 406 (C.A. 2, 1957), remanding for further proceedings a Memorandum Opinion of this Court; *J. A. Maurer, Inc.*, 30 T.C. 1273, 1289–1290

---

[5] We note that it was held in *Bradford* v. *Commissioner*, 233 F. 2d 935 (C.A. 6, 1956), that no income was realized on the discharge of a taxpayer's liability if the taxpayer had received no consideration at the time the liability was contracted. The *Bradford* court was not considering a tax liability, and since the point has not been raised in the instant case we do not decide whether this doctrine should or could be extended to a tax liability.

1074

(1958). The burden of proving the reality of the indebtedness is on the taxpaper. E.g., *Diamond Bros. Co.* v. *Commissioner, supra* at 730. *Martin M. Dittmar*, 23 T.C. 789, 795 (1955).

Since almost every relationship in which the debt-equity issue arises possesses both debt characteristics and equity characteristics, a factorial analysis is usually necessary to determine on which side of the debt-equity line the relationship falls. E.g., *John Kelley Co.* v. *Commissioner*, 326 U.S. 521, 530 (1946) ; *O. H. Kruse Grain & Milling* v. *Commissioner*, 279 F. 2d 123 (C.A. 9, 1960), affirming a Memorandum Opinion of this Court. The factors revealed here balance in favor of respondent's view that the 1954 transfer constituted a contribution to Yale's capital.

While it is true that Yale issued a note and a real estate mortgage securing the note as evidence of Yale's purported debt to Max and Tookah in respect of the 1954 transfer of the Yale tract to Yale, no citation is needed for the proposition that the mere issuance of such instruments is not dispositive of the issue.[6] Similarly, though it may be relevant that upon the transfer petitioners credited notes payable as well as capital stock, book entries of this sort provide much less than compelling evidence of the true substance of the transfer. E.g., *Isidor Dobkin*, 15 T.C. 31, 33 (1950), affirmed per curiam 192 F. 2d 392 (C.A. 2, 1951) ; *Sam Schnitzer*, 13 T.C. 43, 60–61 (1949), affirmed per curiam 183 F. 2d 70 (C.A. 9, 1950), certiorari denied 340 U.S. 911 (1951).

Whatever these formal indicia may show of the true character of the 1954 transfer is far outweighed by the existence of factors which indicate that, in any real sense, the transfer was a contribution to capital.

In particular the evidence shows that the note itself was not treated as an instrument of indebtedness. For example, it was to reach maturity in 3 years, but there is no evidence that during or after those 3 years Yale ever repaid any principal amounts on the note to Max and Tookah. Furthermore, we have affirmatively found that Max never attempted to enforce payment on the note and there is no evidence that Tookah ever sought to enforce its payment. In addition, while the note provided for interest at the rate of 3 percent per annum, there is no evidence that such interest was paid. Indeed, we have found

---

[6] Petitioners imply that in a preliminary statement of the tax liability of Tookah's estate respondent's finding that the value of petitioners' stock was "nil" was respondent's recognition that Yale's note and Forty-First's purported obligation to Max and/or Tookah were bona fide debts. Without pursuing this point further we need only note that the Commissioner's acceptance of a particular factual conclusion in the administrative disposition of a tax dispute would hardly bind him in a later dispute involving the same taxpayer, much less in a dispute involving a different taxpayer. See *Union Equity Cooperative Exchange*, 58 T.C. 397 (1972), and cases cited.

that Yale never deducted such interest nor did Max or Tookah ever include such interest in their own income.

But, what most strongly supports respondent was the manner in which repayment of the debt purportedly arising from the 1954 transfer was tied to the success of Yale's contemplated venture. Yale could not have paid off its purported obligations to Max and Tookah unless it succeeded in selling the lots created by subdividing the Yale tract. Thus, Yale's repayment of the purported obligation to Max and Tookah depended wholly upon the success of Yale's subdividing venture, a factor which creates a powerful inference that the tract was a contribution to capital. See *Gilbert* v. *Commissioner*, 262 F. 2d at 514; *Burr Oaks Corp.*, 43 T.C. 635 (1965), affd. 365 F. 2d 24 (C.A. 7, 1966), certiorari denied 385 U.S. 1007 (1967).

In summary, with respect to docket No. 7500–70 we conclude that the 1954 transfer constituted a contribution to Yale's capital, that as a consequence Yale was solvent both before and after the 1967 discharge of indebtedness, and that, therefore, Yale realized income from that discharge.

We turn now to docket No. 7501–70 and the issue of Forty-First's financial status at the time of the 1967 discharge of indebtedness.

In 1955 Max and Tookah transferred the Forty-First tract to Forty-First. Forty-First's directors had previously resolved that the Forty-First tract was worth $89,024 and had agreed to exchange Forty-First's stock and $84,024 in cash for the tract.

In 1960 in litigation arising in this Court between the Commissioner and Forty-First one of the issues was whether this transfer to Forty-First was a nontaxable transfer under section 351. The litigation was finally settled and because of his reading of a collateral agreement relevant to that settlement, respondent has conceded that the transfer to Forty-First was a sale rather than a contribution to capital. In that collateral agreement it was agreed that in 1955 Forty-First paid $47,875 to Max and Tookah for the Forty-First tract.

Respondent contends that $57,875 (the sum of $47,875 paid by Forty-First in 1955 and $10,000 representing the par value of all of Forty-First's authorized stock) was the true purchase price for the Forty-First tract. He further contends that $31,149 (the difference between $89,024, the value of the Forty-First tract as determined by Forty-First's directors, and $57,875, respondent's view of the true purchase price) was not a part of the purchase price paid by Forty-First, and hence never represented a true indebtedness of Forty-First. Respondent's reasoning would require a reduction of Forty-First's liabilities to a level which would have rendered Forty-First solvent at the time of the 1967 discharge of indebtedness.

We must accept respondent's reasoning because Forty-First has failed to present adequate evidence of the tract's value at the time of the 1955 transfer.[7]

The only indication that the Forty-First tract had a value of $89,024 was the resolution of Forty-First's directors that such was the tract's value. Needless to say this resolution is of minimal evidentiary force when it is seen that Forty-First was completely dominated by Max and Tookah. The resolution was no more evidence of the tract's fair market value than if Max and Tookah had declared the tract to be worth that much.[8] It would be more plausible that the tract had a value of $57,875 since, from what this record shows, that is all that Max and Tookah actually received for the tract.

In summary, with respect to docket No. 7501–70 we conclude that Forty-First has failed to show that at the time of the 1955 transfer the Forty-First tract had a value of over $57,875, that as a consequence Forty-First has failed to show that it was insolvent both before and after the 1967 discharge of indebtedness, and that, therefore, respondent's determination that Forty-First realized income from that discharge must be upheld.

We must now decide whether petitioners are liable for penalties under section 6651(a) for failure to file timely income tax returns. Both petitioners' returns were filed long after the prescribed filing date. Unless they can show that the failure to file was due to reasonable cause, and was not due to willful neglect, the penalties must be imposed. Sec. 6651(a).

Respondent does not suggest that petitioners' failure to file timely returns was due to willful neglect but does question whether such failure was due to reasonable cause. Petitioners contend that their reliance on their accountant amounted to reasonable cause. We cannot agree.

It is true that in many instances reliance upon the advice of an attorney, accountant, or other tax adviser has been found to constitute reasonable cause. See 10 Mertens, Law of Federal Income Taxation, sec. 55.23, pp. 171–176 (Malone rev. ed. 1970), and cases cited. However, unless certain conditions are met, reliance upon a tax adviser

---

[7] We have already disposed of one of Forty-First's contentions in fn. 6 *supra*.

[8] Petitioners argue that under Oklahoma State law a director's determination of the fair value of any consideration (other than money) for which a corporation's shares are allotted shall, in the absence of fraud in the making of such determination, be conclusive. See Okla. Stat. Ann. tit. 18, sec. 1.76b (1953). While such a determination may be conclusive as among shareholders, directors, and other interested parties who are able to protect their interests at the time of the determination and allotment, we do not believe the statute could be made to apply to relieve Forty-First of the burden it has in proving its case against the Commissioner, a third party who had no stake in the determination and did not know that his interest would be affected until years after the determination had been made.

will not excuse a taxpayer from the penalty imposed by section 6651 (a). Thus, it should be shown that the person relied upon is qualified to give competent tax advice. *Mayflower Investment Co.*, 24 T.C. 729, 733 (1955), affd. 239 F. 2d 624 (C.A. 5, 1956) ; *Heatbath Corporation*, 14 T.C. 332, 349 (1950). In this respect we note that petitioners' accountant did not know that under the regulations even a corporation which does not have taxable income may still be required to file a return. See sec. 1.6012–2(a) (1), Income Tax Regs. Furthermore, it must be shown that the adviser had sufficient knowledge of the taxpayer's relevant financial circumstances. *Fourth & Railroad Realty Co.*, 25 T.C. 458, 461 (1955). Here, the evidence shows that petitioners had failed to inform their accountant of the 1967 settlement which resulted in the discharges of indebtedness. Petitioners' failure to disclose this critical fact nullified the existence of any reasonable cause which might have been indicated by the fact of petitioners' reliance on their accountant.

*Decisions will be entered for the respondent.*