ANDREW J. McALISTER, JR. and ALBERTA L. McALISTER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McAlister v. Commissioner
Docket No. 7657-73
United States Tax Court
T.C. Memo 1976-51; 1976 Tax Ct. Memo LEXIS 351; 35 T.C.M. (CCH) 232; T.C.M. (RIA) 760051; February 26, 1976, Filed James L. Edgar, for the petitioners. Michael J. O'Brien, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent has determined a deficiency in petitioners' Federal income tax for the taxable year 1970 in the amount of $2,323.56 plus an addition to tax under section 6653(a) [1] in the amount of $116.18. The issues for decision are: (1) Whether, to the extent they remained unpaid, amounts advanced by petitioners to the corporation in which they were majority shareholders represented capital contributions or bad debts. Further, if the sums were bad debts, whether such sums were business or nonbusiness bad debts; (2) Whether petitioners understated *352 their taxable income for the tax year 1970; (3) Whether any part of any underpayment of petitioners' income tax liability for the taxable year 1970 was due to negligence or intentional disregard of rules and regulations. [2]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The petitioners, Andrew J. McAlister, Jr. (Andrew) and Alberta L. McAlister (Alberta), husband and wife, maintained their legal residence in Tulsa, Oklahoma at the time their petition was filed herein. They filed joint Federal income tax returns for the taxable year 1970, using the cash basis method of accounting, with the internal revenue service center in Austin, Texas. Since 1947 Andrew has been an engineer in the field of construction, services, and repairs relating *353 generally to the oil and gas industry. Andrew was an employee of Warren Petroleum Company until 1959, when he left to become president of Pioneer Drilling Company. In 1963 Andrew formed a new corporation, Mac Engineering Company, (Mac Engineering) which was primarily engaged in the engineering and construction of natural gas plants and its related facilities. Upon incorporation, Mac Engineering issued 1,500 shares of stock with a par value of $1 each, thereby generating a stated capital of $1,500. From the time of the incorporation in 1963, until the company ceased operation in 1970, petitioners owned at least 70 to 80 percent of the stock of Mac Engineering. As of January 1, 1970 petitioners were the sole shareholders. Andrew was president of Mac Engineering during the life of the corporation. Beginning on July 3, 1963, petitioners made a series of advances to the corporation. These advances are evidenced by checks issued from petitioners to Mac Engineering on the following dates and in the following amounts: July 3, 1963
$9,000
March 10, 1965
7,000
March 12, 1965
2,500 [3]
December 11, 1967
450
January 31, 1968
1,000
February 1, 1968
500
February 7, 1968
7,000
September 11, 1969
1,500
*354 Some of the advances were evidenced by notes and some were not. Notes in the following amounts were executed on the dates indicated by Mac Engineering in favor of petitioners: July 12, 1963
$9,000
March 10, 1965
7,000
March 12, 1965
2,500
December 3, 1965
3,500 [4]
*355 The advances made by petitioners were otherwise unsecured. Although each of the notes carried an interest rate of 6 percent, no interest was paid on any of the advances. Petitioners characterized the advances as loans, but there were no specific terms for repayment. [5]
The sums advanced were intended to give Mac Engineering sufficient funds on which to operate. They were typically given to Mac Engineering in order to fund particular jobs. Repayment of the advances depended on the success of the particular operation. Mac Engineering was chronically short of funds. During 1968 and 1969, Mac Engineering was engaged in the construction of a gasoline plant in Kansas for Kathol Natural Gas Company (Kathol). Sometime in 1969, Kathol ceased making payments to Mac Engineering for the construction work it was performing. Shortly after the cessation of these payments, Andrew suffered *356 a heart attack. By October 1969, the combination of these two events caused Mac Engineering to cease its construction and engineering projects. Andrew returned to work in early 1970 and attempted to revive Mac Engineering's business. Unfortunately, his efforts were not successful. In June of 1970 an involuntary petition in bankruptcy was filed against Mac Engineering in the United States District Court for the Northern District of Oklahoma. Shortly thereafter, the corporation was adjudicated bankrupt. Most of Mac Engineering's tangible assets had been purchased by Andrew personally a few months prior to the involuntary petition. The only assets listed by Mac Engineering in its schedule of assets was cash of $21.34 and a chose in action against Kathol for $176,880.29. [6]
The liabilities to unsecured creditors amounted to $65,750.75. Among those liabilities listed was a debt owing to A.J. McAlister, Jr., for $14,809.57. Andrew had received payments from Mac Engineering in 1969 in excess of $16,600. [7]
*357 On their joint return for 1970, petitioners claimed a bad debt deduction of $18,000 for worthless loans to Mac Engineering. Respondent has disallowed these amounts in full. Petitioners reported $12,000 income from "consulting, self-employment," and $16 interest income for 1970. Thus, adjusted gross income as reported on their return for 1970 was $12,016. In his statutory notice of deficiency, respondent reconstructed petitioners' income using the source and application of funds method. In finding petitioners had understated their income by $4,739.48, respondent made the following computation: Application of Funds Item
Amount
Increase Bank Account
Utica Bank
Balance 1/1/70
$ 398.72
Balance 12/31/70
1,241.20
Increase
$ 842.48
Advances to:
Mac Engineering
1,245.00
Southland Steel
4,000.00
Personal Living Expense
Food
2,600.00
Housing
2,721.00
Transportation
1,600.00
Clothing
600.00
Medical
1,700.00
Taxes
847.00
Entertainment and Misc.
600.00
$10,668.00
Total Application of Funds
$16,755.48
Source of Funds
Adjusted Gross Income per Return
$12,016.00
Increased Income
$ 4,739.48
*358 During 1970, the McAlister household consisted of 5 persons--petitioners and their 3 daughters. OPINION Our first task is to determine how much of the sums advanced by petitioners to Mac Engineering remained unpaid in 1970. On their 1970 return petitioners deducted $18,000 as a bad debt. Petitioners now claim that the unpaid balance of the sums advanced to Mac Engineering amounted to $33,805. Respondent has disallowed petitioners' deduction in full, taking the position that petitioners have failed to establish the amount of the advances to Mac Engineering which remained unpaid as of December 31, 1970. Petitioners have been able to establish, by cancelled checks, advances to Mac Engineering totaling $29,950. The extent to which these advances were repaid by Mac Engineering, however, is less clear. The record suggests a variety of possibilities. Viewing the evidence as a whole, with particular emphasis on the "Schedules of Bankrupt" [8] filed by Mac Engineering, in the bankruptcy proceeding, we have determined that the unpaid advances amounted to $14,809.57. Having decided the amount of the unpaid advances, the character of these sums must be determined. Petitioners have characterized *359 these advances as bad debts. Respondent, on the other hand, argues that the advances were in fact contributions to capital. Whether advances to a corporation by shareholders create a debt or constitute contributions to capital is a question of fact on which the petitioner has the burden of proof. Gilbert v. Commissioner,262 F.2d 512 (2nd Cir. 1959); Yale Avenue Corp., 58 T.C. 1062 (1972). In determining whether such advances more closely resemble debt or equity the Courts have looked to a number of factors, e.g., the relationship between the parties, whether there is adequate capitalization, whether interest was paid or payable on the advances, whether an outside investor would have made similar investments without security, and whether such advances were placed at the risk of the business and thus constituted risk capital. See O. H. Kruse Grain & Milling v. Commissioner,279 F.2d 123 (9th Cir. 1960); Road Materials, Inc. v. Commissioner,407 F.2d 1121 (4th Cir. 1969); Gilbert v. Commissioner,supra;Yale Avenue Corp., supra.
The facts here make it clear that petitioners' *360 advances to Mac Engineering represented contributions to capital. No interest was paid on any of the advances. In most cases, the advances were not even evidenced by notes. Aside from the notes, there was no security given for any of the advances. No written agreement establishing the term or condition of the "loans" was executed between petitioners and Mac Engineering. Mac Engineering was under-capitalized and needed the funds in order to operate. These funds were then placed at the risk of the business; repayments depended upon the success of the particular project in which the business was engaged at the time of the advances. Under these circumstances no prudent outside lender would have made similar advances. We therefore conclude that the advances made by petitioners represented an equity investment, and could not properly be characterized as loans. Respondent further contends that if the advances were equity rather than debt, the stock representing such equity became worthless in 1969, rather than 1970. The year in which these equity investments become worthless is likewise a question of fact. Boehm v. Commissioner,326 U.S. 287 (1945); Joseph C. Lincoln,24 T.C. 669, 694 (1955). *361 In determining the year in which stock becomes worthless, it must be established that the stock has no current liquidating value, and further, that such stock has no potential value. Joseph C. Lincoln,supra;SterlingMorton,38 B.T.A. 1270 (1938), affd. 112 F.2d 320 (7th Cir. 1940). As we observed in Morton at 1278-9: The ultimate value of stock, and conversely its worthlessness, willedapend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life *362 which puts an end to such hope and expectation. While the corporation was very clearly in difficult financial straits late in 1969, it was not until early 1970 that it became apparent that there was little if any hope for Mac Engineering's future. The filing of the involuntary bankruptcy petition in June of 1970 completely foreclosed any possibility that the business could be revived. We therefore find that petitioner's equity advances to Mac Engineering became worthless in 1970. Respondent has determined that petitioners' books and records were inadequate and has reconstructed their income using the source and application of funds method. See Engene Vassallo,23 T.C. 656 (1955); Max Cohen,9 T.C. 1156 (1947), affd. 176 F.2d 394 (10th Cir. 1949); United States v. Caserta,199 F.2d 905 (3d Cir. 1952). Cf. United States v. Johnson,319 U.S. 503 (1943). Using this method, respondent has determined that petitioners have understated their 1970 income by $4,739.48. The source and application of funds method is based upon the assumption that the amount by which a taxpayer's application of funds during *363 a taxable period exceeds his known sources of income for that period is taxable income, unless the taxpayer can show his expenditures were made from some nontaxable source of funds. In the instant case petitioners do not challenge the items used by respondent in computing petitioners' application of funds during 1970. Instead, petitioners argue that any excess expenditures were made from a nontaxable source of funds, namely, the sale of certain property on which no gain was recognizable. We have concluded, however, that petitioners' evidence is insufficient to establish the existence of this source of funds. Petitioners introduced into evidence a copy of an unexecuted duplicate draft drawn on a Texas bank in the amount of $9,000, dated January 1, 1970 and payable to Andrew. Petitioners contend that this exhibit represented the proceeds of a sale of Andrew's interest in an oil and gas lease in Kansas which had been purchased by Andrew in July, 1969 for $10,000. Since the overall transaction resulted in a $1,000 loss petitioners conclude that the $9,000 represents a capital loss, and therefore a nontaxable source of income. Unfortunately, the exhibit introduced into evidence by petitioners *364 does not establish to our satisfaction the existence of a nontaxable source of funds. There is no indication on the face of the document that the transaction which it purports to represent was ever completed. The Court, therefore, left the record open to give petitioners the opportunity of producing the original of this exhibit. Petitioners, however, failed to produce the original or give an explanation of why they were unable to obtain it. In addition to the insufficiency of the exhibit itself, there was no corroborating evidence presented by petitioners which might prove that a sale took place and that the proceeds therefrom were nontaxable. Although petitioners' bank records were introduced into evidence, a $9,000 deposit appears nowhere among them. No loss was taken on petitioners' return. In fact, there is no evidence in the record at all which might be helpful in establishing this $9,000 source of funds. We must, therefore, sustain respondent's determination on this issue. Finally, respondent has determined additions to tax pursuant to section 6653(a). Section 6653(a) provides that "If any part of any underpayment * * * is due to negligence or intentional disregard of rules *365 and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment." Petitioners have the burden of proving that this addition to tax is erroneous. Vaira v. Commissioner,444 F.2d, 770 (3d Cir. 1971); Mark Bixby,58 T.C. 757 (1972); Terry C. Rosano,46 T.C. 681 (1966). Petitioner has not presented any evidence on this issue. Consequently, we must sustain respondent's determination as to the additions to tax. Rule 149(b), Tax Court Rules of Practice and Procedure.James S. Reily,53 T.C. 8 (1969). Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
2. Although there is some dispute over the amount of self-employment taxes (see section 1401) owed by petitioners for 1970, the parties agree that the amount of such taxes will be determined by the resolution of the remaining issues in this proceeding. The allowable medical deductions for that year will likewise depend on such resolution. Accordingly, both will be handled in the Rule 155 computation.↩
3. This check was made payable to the National Bank of Tulsa, and not to Mac Engineering directly. Mac Engineering had borrowed money from the bank by factoring certain accounts receivable. When the receivables were not paid, Mac Engineering did not have the money to repay the bank from its own funds. Petitioners therefore paid the bank with their personal checks.↩
4. While we have a copy of this note, there is no evidence (e.g., cancelled check) that the underlying advance was made to Mac Engineering. Petitioners claim that most of their personal records were destroyed when a bank foreclosed against another corporation in which they had a substantial interest. We have not, however, found petitioners' explanation very compelling. Moreover, petitioners have not provided the Court with any evidence other than their own testimony which might lend support for this explanation. Despite their difficulty, petitioners did have most of the records needed for trial.↩
5. The balance sheet for February 28, 1966 lists as a longterm liability "Note payable-shareholder $6,000." In the June 30, 1966 balance sheet this sum is $1,046. Finally, on the November 30, 1968 balance sheet the sum of $5,447 is listed under the heading "Notes Payable" without further designation.↩
6. The amount due from Kathol had been assigned to the Fourth National Bank of Tulsa, Tulsa, Oklahoma as collateral for its loans outstanding to Mac Engineering.↩
7. It is doubtful much of this amount represented salary. Andrew's actual wages from Mac Engineering were generally quite low (e.g., 1963- $0; 1966-$1,321.56; 1967-$1,232.50).↩
8. These schedules were sworn to under oath by Andrew.↩