DAVID J. STARK and ANNA STARK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stark v. Commissioner
Docket No. 975-78.
United States Tax Court
T.C. Memo 1982-639; 1982 Tax Ct. Memo LEXIS 107; 45 T.C.M. (CCH) 22; T.C.M. (RIA) 82639; November 4, 1982
*107 Andrew F. Tegethoff, Jr., for the petitioners. Henry Thomas Schafer, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioners' Federal income tax and an addition to tax under section 6651(a)(1) [1] as follows: Taxable year
Deficiency [2]
Section 6651(a)(1)
1969
$75,586.36
1973
1,920.13
1974
17,281.76
$4,320.44
After concessions, the issues for decision are: 1. The amounts of the unreimbursed advances petitioners made to or for the benefit of petitioner-husband's *108 wholly-owned corporation; 2. Whether any of the unreimbursed advances were bona fide loans or contributions to capital; 3. If loans, whether they became worthless in the taxable year that each was claimed as a deduction for bad debts; 4. If bad debts, whether they were business or nonbusiness bad debts within the meaning of section 166; and 5. Whether petitioners' failure to file their 1974 income tax return on time was due to reasonable cause within the meaning of section 6651(a)(1). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, and the attached exhibits are incorporated herein by this reference. Petitioners David J. Stark and Anna Stark resided at 1919 Bayshore Drive, S. W. Calgary, Alberta, Canada, when they filed their petition in this case. They filed joint United States Income tax returns as follows: Year
Date Due [3] *109 Date Filed
Place Filed
1969
April 15, 1970
April 15, 1970
Chamblee, Georgia
1972
July 13, 1973
November 26, 1973
Kansas City, Missouri
1973
June 15, 1974
April 18, 1975
Kansas City, Missouri
1974
April 15, 1975
December 23, 1975
Philadelphia, Pennsylvania Since Anna Stark is a party to this proceeding solely because she filed joint returns with her husband, the term petitioner will refer to David J. Stark. For many years up to 1966, petitioner had been employed by various corporations as a mining engineer or executive. From 1959 to about 1965, he worked for International Minerals and Chemicals Company. By 1965, he was drawing a salary (including performance bonuses) of $70,000 to $75,000. In 1965, he left his employment, started making investments, and began other entrepreneurial activities in developing new small companies. From 1969 through 1974, petitioner was the sole owner of all of the outstanding stock of Chicopee Associates, Inc. [4] Chicopee Associates, Inc. was formed to arrange venture *110 capital investments on a larger scale than D. J. Stark and Associates, discussed below. Some of Chicopee's activities included a fertilizer venture in the Province of Quebec, a potash mining venture, and a venture involving the development of an electronic scanner program in London, England. From 1969 through 1974, petitioner was also the sole owner of all the outstanding stock of D. J. Stark and Associates (Florida), Inc. (hereinafter referred to as Associates), which petitioner considered as his "personal vehicle" for developing various management and consulting deals. The principal business activity of Associates as reported in its 1971 Corporation Income Tax Return (Form 1120) was business consulting and computer service. Petitioner's business relationship with both Chicopee *111 and Associates was that of an entrepreneur or developer as opposed to a salaried employee. One of petitioner's sources of income was a royalty agreement with New Jersey Zinc from which he reported income of about $46,000 each year in 1969 and 1970. In January 1971, New Jersey Zinc stopped making these payments to petitioner when Gulf and Western Corporation, which had acquired New Jersey Ainc, contested the validity of that contract. On November 26, 1971, petitioner and New Jersey Zinc made a settlement agreement, the terms of which called for an immediate payment to petitioner of $21,000 in 1971 and $105,000 to be paid in 20 quarterly payments of $5,250 each or $21,000 per year for the next five years. By March of 1971, petitioner had moved to Melbourne, Florida. His source of income at the time was what he regarded as a nominal amount of dividends from stocks which he had earlier acquired. Petitioner felt that he was living primarily on his capital assets and that his lettered stock was worth only between $150,000 and $200,000 of equivalent unlettered stock. However, a financial statement dated May 16, 1971, and signed by petitioner stated his net worth as $483,082. The record *112 does not establish petitioner's actual net worth in early 1971, but whatever it was, it was not satisfactory to petitioner and he began looking for a new source of current income. [5]
In the spring of 1971, petitioner was contacted by a friend, William Lord, who informed him about a business opportunity with Electrical Utilities Construction Company (EUCC) whose principal office was in Mulberry, Florida. EUCC was an electrical contractor in the Florida area, specializing in transmission and distribution work for utility companies and large industrial firms as a union contractor. The business of EUCC involved working with two categories of transmission lines, but primarily high lines transmitting 13,000 or more volts of electricity. Distribution involves bringing *113 electricity to household transformers where the volt level is brought down from 13,000 to household levels. EUCC installed high line wires, lowered the voltage from the 130,000 to the 13,000 level, and constructed transformer stations in between the step-down from the transmission to the distribution phase, the latter involving running electric lines to houses. The work was performed by journeymen electricians, foremen, and general foremen provided by the union groups. EUCC was a member of the National Electric Contractors Association. EUCC did not design the systems that were installed. Rather, the projects were designed by the client companies or by engineering firms retained by the clients. When Bill Lord contacted petitioner about EUCC, the corporation was not in sound financial condition. On the corporate income tax return for the year ending April 30, 1971, EUCC listed total assets of $133,585.39. Liens had been placed against many of the accounts receivable, equipment, and inventory to secure EUCC's debt. On this tax return, the corporation reported trade accounts payable of $52,977.46, other short-term debt of $125,592.36, and long-term debt of $30,826.01. The debts *114 EUCC owed at that time included the following: Creditor
Amount
Internal Revenue Service Lien
[6] $22,404.63
W. W. Lord
35,750.00
First National Bank of Lakeland
39,900.00
First State Bank of Lakeland
20,000.00
Ann Cusick
9,000.00
M. Esposito
21,000.00
EUCC also reported a deficit in retained earnings of $79,324.72. At that time Jack Carr was the president and owner of EUCC and Bill Lord was providing the financial backing for the company. In spite of the poor financial condition of EUCC, petitioner thought he could turn the business around and make it profitable. Petitioner thought that the business could become sufficiently profitable to generate earnings of $5,000 to $6,000 a month. EUCC had two contracts that interested petitioner. One was a long-term cost-plus contract with Tampa *115 Electric Company that was producing gross income of about $300,000 for total labor and materials on a cost-plus basis but was still losing money. The other contract was with American Cyanamid Company for $155,000 to provide distribution facilities in a new plant being built. Bill Lord had told petitioner that EUCC had employed a man who was a competent field supervisor but who was a poor administrator and businessman. Petitioner thought that by reducing overhead and taking other steps to insure better management he could make these contracts and EUCC profitable. EUCC had 100 shares of outstanding stock owned by J. G. Carr, J. G. Carr, III, and Theresa Imes. J.G. Carr as president of the company owned 50 of the 100 outstanding shares. J. G. Carr, III owned 48 of the shares, and Theresa Imes, a bookkeeper and secretary of EUCC, owned two shares. At that time Bill Lord had an option to purchase 75 percent of the EUCC stock. And that 75 percent of the stock had been pledged by EUCC as collateral to secure the promissory notes given to Lord for the monies he had already advanced to the corporation. The shareholders of EUCC considered the financial condition of the corporation and *116 resolved that, in order to give EUCC an opportunity to survive, it was necessary to grant petitioner an option to purchase 100 percent of the stock of EUCC in exchange for petitioner's promise to advance EUCC money for working capital. On May 17, 1971, petitioner entered into an agreement with J. G. Carr and EUCC, whereby petitioner obtained an option to purchase 100 percent of the outstanding stock of EUCC for $10,000 [7] *117 and obligated himself to advance funds to EUCC for working capital. Petitioner agreed to advance $30,000 promptly which was to be interest free until October 15, 1971, by which time EUCC was to reimburse petitioner.The parties also agreed that all advances in excess of $30,000 were to be due in not more than three years and were to bear interest at the rate of eight percent annually. The parties also agreed that petitioner could participate in the management of EUCC. It was agreed that petitioner would be elected to the EUCC board of directors and serve as chairman of the board, while J. G. Carr remained president. Carr however agreed that he would not obligate EUCC or petitioner in any way except when specifically authorized by petitioner. It was also agreed that petitioner would have "complete and final control over any and all fiscal matters of EUCC." The agreement provided that Carr would be paid a salary of $20,800 per year and petitioner would receive a salary of not less than $2,000 per month but the payment would be "deferred until October 31, 1971 or to a later date to be elected by Stark." Carr was to devote full time as an employee of EUCC and petitioner was to devote substantial time to the management and operation of EUCC and as chairman of the board of directors. Petitioner regarded EUCC as in the building phase at that time, and he wanted to pay off the old liabilities of EUCC. Petitioner agreed with some of EUCC's creditors that he would just take "walking around money" out of the corporation and would use *118 the earnings of the corporation to clean up the past track record. Petitioner was subsequently paid $12,000 in salary by EUCC sometime during calendar year 1971. That is the only salary payment petitioner ever received from EUCC. The shareholders of EUCC ratified the agreement on May 18, 1971. They elected petitioner as chairman of the board of directors and chief executive officer of EUCC, and gave him the authority to enter into any agreement which in his sole opinion would improve the corporation and permit it to survive. Petitioner had arranged to have monthly operations reports prepared to assist him in deciding whether or not to exercise his option and continue with EUCC. Petitioner assisted in preparing information with respect to the status of the contracts. He used information from completion reports prepared by the superintendent in the field, with the approval of various engineers inspecting the job progress. Petitioner did not assist in preparing statements with respect to accounts receivable and accounts payable; these were done by the EUCC bookkeeper (three different women at different times) involved with keeping EUCC books and records. The balance sheet prepared *119 for the monthly operations report dated May 31, 1971, was as follows: ELECTRIC UTILITIES CONSTRUCTION CORP.
BALANCE SHEET
May 31, 1971
ASSETS
CURRENT ASSETS: Cash in Bank on Hand
$12,501.30 Accounts Receivable-Trade
16,250.00 Material Inventory
18,158.86 Prepaid Insurance
6,116.39 Total Current Assets
$53,026.55 FIXED ASSETS: Autos and Trucks
$ 20,051.67 Construction Equipment
33,250.92 Tools and Rubber Goods
52,174.25 Radio System
4,948.03 Office Furniture and Fixtures
5,738.33 Leasehold Improvements
6,239.07 Total Cost
$122,402.27 Reserve for Depreciation
38,073.08 Total Fixed Assets
84,329.19 OTHER ASSETS: Deposit Held by Others
455.00 Due from Officers and Stockholders
27,554.87 Total Other Assets
28,009.87 TOTAL ASSETS
$165,365.61 LIABILITIES
CURRENT LIABILITIES: Accounts Payable
$ 21,188.63 Accrued and Withheld Taxes
1,451.70 Accrued and Withheld Taxes-Prior
Period
16,356.60 Accrued Payroll and Union Dues
5,433.71 Notes Payable Due in One Year
63,560.16 Total Current Liabilities
107,990.80 DEFERRED LIABILITIES: Notes Payable Due After One
Year
125,201.94 NET WORTH
Capital Stock
1,000.00 Retained Earnings (Deficit)
($68,014.86)
Net Profit (Loss) Mo. of
May 1971
( 812.27)
Retained Earnings (Deficit)
May 31, 1971
(68,827.13)
Total Net Worth
( 67,827.13)
TOTAL LIABILITIES AND NET WORTH
$165,365.61 *120 Petitioner managed EUCC from May through August 1971 under the agreement with EUCC. He was of the opinion that EUCC could become profitable under proper management. Petitioner had made agreements with some of EUCC's bank creditors to be placed on a monthly payment schedule over a long-term basis. The accounts payable were also placed on an agreed payment schedule. The earnings from the Tampa Electric Company and the American Cyanamid Company contracts were used to reduce some of the old indebtedness of EUCC. Petitioner was advancing money to EUCC to be used as working capital. Between May 21 and August 27, 1971, petitioner borrowed $97,500 from the National Bank of Melbourne and Trust Company. Of this amount, petitioner advanced $56,000 to or for the benefit of EUCC. Petitioner also advanced another $42,500 to EUCC during this time for total advances of $98,500. [8] Most of the money was used for current operating expenses, primarily the EUCC payroll. The sum of $18,000 was used for payment of the Internal Revenue Service lien. During the time period from May 21 through August 27, 1971, EUCC repaid petitioner $20,000. The net amount of unreimbursed advances during this period *121 was $78,500. At first EUCC may have executed some notes to evidence its indebtedness to petitioner, but, if so, none of these notes were produced at trial. Essentially, petitioner advanced money to EUCC when it was needed and withdrew money when and as he could. Other than the parties' original agreement that all advances over $30,000 would be repaid in no more than three years, there was no definite schedule of repayments. This loose arrangement continued throughout 1971 and 1972. On August 27, 1971, petitioner exercised his option to purchase the EUCC stock. He paid J. G. Carr $5,500 cash and promised to pay the balance of $4,500 on or before December 1, 1971. Also on August 27, 1971, Carr resigned as president and agreed to serve as executive vice president of EUCC. Petitioner replaced Carr as president and continued to serve as chairman of the board of directors. In August 1971 some of petitioner's advances were identified as "subordinated debentures" on the balance sheet of the EUCC monthly operations report. The treatment of these advances on the EUCC balance sheet *122 was never consistent. The advances were sometimes listed as "Note Payable D.J. Stark." None of these balance sheets had been audited. Some of petitioner's advances, the amount of which cannot be determined from the record, were subordinated to the banks because the banks insisted on priority. EUCC filed a corporate income tax return for the short-year period May 1 to October 31, 1971. The corporation reported taxable income of $5,530.32 before taking into account a net operating loss. On November 1, 1971, D.J. Stark and Associates (Florida), Inc., (Associates), petitioner's wholly-owned corporation, acquired all of the outstanding stock of EUCC. On November 4, 1971, petitioner, Charles Carroll, and EUCC entered into a Master Surety Agreement with United States Fidelity & Guaranty Co. (USF&G). [9] *123 EUCC had started out with smaller contracts but wanted to expand its operations, but in order to get larger jobs, it was necessary to be able to obtain bonding. The bulk of all electrical transmission work in that area of Florida was in state and local government contracts. The governmental agencies generally would not issue contracts without bid and performance bonds. Generally the larger electrical contracts were obtained by competitive bidding on contracts usually calling for a performance bond. The normal procedure on bidding was to require a firm bid accompanied by a bid bond. After being chosen as the successful bidder, the contractor had to provide a performance bond for the job. Between the time the bid was made and the contractor selected, a bidder could withdraw the bid only by forfeiting on the bid bond. Once the contractor provided the performance bond, the contractor and the bonding company were responsible for completion of the job. The Master Surety Agreement provided "By executing this Agreement you are bound to Surety with respect to all Bond(s) executed, provided or procured or to be executed, provided or procured by Surety in behalf of Principal…". EUCC prepared its monthly operating reports only through February 1972. None of these financial statements were audited. Some of the reports were prepared by Charles Faust, a personal friend of petitioner who was a CPA and a principal in an accounting firm in Lawrenceville, Illinois. Faust also reviewed *124 the monthly reports that he did not prepare. This review was less thorough than would have been the review by an independent CPA following required auditing procedures. Faust described the review as "a compilation as opposed to an auditor review." In 1971 and 1972 Faust made frequent trips from Lawrenceville, Illinois, to Mulberry, Florida, the principal location of EUCC's offices, to review the company's records. However, Faust and his firm never prepared any audited financial statements for EUCC. He reconciled bank statements and reviewed with petitioner on a fairly frequent basis the progress of the EUCC contracts. The EUCC monthly reports prepared and/or reviewed by Faust showed the following information: MONTHLY OPERATION REPORTS SUMMARY
Fixed Assets
Current
Report Date
Cash on Hand
Less Depreciation
Accounts Payable
May 1971
$12,501.30
$84,329.19
$21,188.63
June 1971
18,103.74
82,829.19
50,043.91
July 1971
9,661.57
79,329.19
13,115.11
Aug. 1971
26,997.80
80,958.48
32,008.49
Sept. 1971
28,571.40
75,432.04
10,581.37
Oct. 1971
34,382.74
87,453.95
6,181,56
Nov. 1971
24,130.00
84,453.95
5,230.93
Dec. 1971
72,958.16
82,453.95
31,445.11
Jan. 1972
40,899.26
82,108.95
31,810.03
Feb. 1972
59,889.17
75,682.95
112,885.83
Notes
Notes
Payable
Payable
Note
Subordinated
Less than
Over One
Payable
Debentures by
Report Date
One Year
Year
D.J. Stark
Principal
May 1971
$63,560.16
$125,201.94
June 1971
40,000.00
91,593,38
$69,875.00
unstated
July 1971
40,000.00
89,682.53
61,875.00
unstated
Aug. 1971
40,000.00
39,302.34
unstated
$58,193.46
Sept. 1971
40,000.00
74,110.33
51,875.00
unstated
Oct. 1971
40,000.00
80,129.73
59,321.63
unstated
Nov. 1971
40,000.00
78,194.73
56,141.07
unstated
Dec. 1971
40,000.00
74,259.73
67,243.46
unstated
Jan. 1972
40,000.00
52,308.30
67,243.46
(subordinated)
Feb. 1972
48,000.00
44,374.90
14,617.87
60,000.00
EARNINGS
From
May 1971
Retained
Report Date
Month
to Date
Earnings
May 1971
* $8,800.42 (68,827.13)
June 1971
* 17,030.12 * $27,763.53
(51,561.19)
June 1971
* 45,178,29 * 72,941.82
(6,382.90)
Aug. 1971
* (11,438.82)
* 61,503.00
(17,821.72)
Sept. 1971
* 838.85 * 62,341.85
(16,982.87)
Oct. 1971
* (11,303.65)
* 51,038.20
(28,286.52)
Nov. 1971 ** 44,141.46  ** 95,179.66
15,854.94 Dec. 1971
* (20,760.51) ** 74,419.15
(4,905.57)
Jan. 1972 ** 48,680.56  ** 123,099.71
43,774.99 Feb. 1972 ** (30,311.57)
12,587.94 *125 For tax purposes, EUCC reported on its corporate income tax return (Form 1120 Schedule C) for the short-year period May 1971 to October 31, 1971, the following amounts: [10]
May 1971
October 31, 1971
Cash
$3,102.18 $34,382.74 Fixed assets less
depreciation
78,954.19 55,206.46 Accounts payable
52,977.46 30,038.14 Notes payable - less
than one year
125,592.36 40,000.00 Shareholder loans
2,514.28 59,321.63 Notes payable - more
than one year
30,826.01 80,129.73 Retained earnings
(79,324.72)
(73,794.40)
Following EUCC's acquisition by Associates, EUCC filed consolidated returns with Associates. On the consolidated return for 1971, EUCC reported taxable income of $42,483.77 for the period November 1 to December 31, 1971. Petitioner spent most of his time pursuing new business and bidding new jobs for EUCC. Between January and May of 1972, he was under the impression that EUCC's business was *126 going "like gang busters." The financial records of EUCC for this period are not in evidence, and the record does not establish whether or not EUCC's financial condition improved during this period. In April or May of 1972, petitioner hired Michael Shulman as comptroller, and Shulman was put in charge of the day-to-day cost analysis. During late May or early June 1972, petitioner became apprehensive. He had expected EUCC to need infusions of working capital up until April or May to support the growing backlog of work but he also expected by May to be getting money back from completed contract work and to have turned the corner. He believed that EUCC should have been paying him back on the advances he had made. Instead, petitioner had to continue to advance funds for working capital. Between August 27, 1971, when petitioner exercised his option to acquire the EUCC stock, and June 30, 1972, petitioner advanced another $98,989.40 to EUCC. Of this amount, petitioner had borrowed $50,000 from the National Bank of Melbourne and Trust Company. He had also sold some Petroleum North American stock for $23,842.77 and advanced the proceeds of this sale to EUCC. During this same time EUCC *127 repaid petitioner $39,989.40. Thus, the net unreimbursed advances during this period was $59,646.63. During the first six months of 1972, EUCC borrowed $75,000 from the First National Bank of Lakeland. [11] Each of the notes for those loans was secured by the "Accounts Receivable and Contract Rights" of EUCC and was also endorsed by petitioner in his individual capacity. In mid-1972 petitioner admitted to himself that EUCC was not likely to become profitable. By June of 1972, petitioner thought that EUCC had no real future. EUCC was obligated to perform several existing contracts but in petitioner's opinion there was no real chance of putting EUCC back on its feet without a large infusion of capital. By this time the records of EUCC were so confused that any financial reports would have had to be so greatly qualified as to be meaningless. Petitioner felt that the existing records showed such deep trouble that it was not worth while to spend an additional $2,000 to $5,000 to have Faust prepare accounting reports that would have any value. *128 Also, possibly since February 1972 but at least by this time, EUCC had stopped keeping even the unaudited types of books and records it had maintained before. Ledgers were posted but no further monthly operating reports and statements of assets and liabilities were prepared. EUCC had a large number of accounts payable that had not been paid. [12] *129 EUCC's ledger and journal are not in evidence, and the alleged disappearance of these corporate books and records was alluded to but not adequately explained by petitioner or Faust. Petitioner thought that EUCC was in serious financial trouble and probably owed more money that it could collect. In addition to the accumulation of unpaid bills, petitioner discovered problems in the various electrical contracts. The percentage of work completed had been overstated on some contracts and some of the newer contracts had been underbid. A consequence of overstating the percentage of completion was that since EUCC was paid on the basis of completion, it had already been paid for work that had not yet been performed and that would also require additional funds to complete. Petitioner's concern was heightened by the fact that EUCC had just been selected and had secured performance bonds on two contracts in April and two contracts in May 1972. Those bids had been based on the experience on the earlier contracts and the fact that those earlier contracts *130 had not proved to be profitable indicated to petitioner that the new contracts would also be unprofitable. Moreover, since petitioner had recently been competing for the larger contracts for EUCC, he apparently had offended someone in the area. He thought that this resulted in EUCC's jobs being "slow walked" by the union employees and that the slow-down resulted in increased expense and losses on the contracts. In June 1972, petitioner reevaluated EUCC's financial condition. He made on-site inspections of each of the jobs and reexamined all of EUCC's contracts. At that time he anticipated additional losses of over $500,000 on five contracts for which USF&G had provided performance bonds. Petitioner consulted with Faust who said that EUCC was flat broke and who said that he did not see how EUCC could become profitable again. However, petitioner took a more optimistic viewpoint. Petitioner took several steps in an attempt to minimize EUCC's losses and improve profitability on existing contracts. He replaced the general foreman with another general foreman who was highly recommended. Petitioner obtained an agreement from the Jacksonville Electrical Authority to cancel one of *131 the contracts that EUCC had recently obtained. [13] Petitioner also stopped bidding on new contracts and tried to have EUCC's existing contracts completed with nonunion labor by subcontracting the projects. Contracts with the City of Fort Pierce and the City of Vero Beach were subcontracted to a nonunion contractor. In the summer and fall of 1972, EUCC began subcontracting some of its projects to petitioner's other corporation, Chicopee, which had not previously been involved in the electrical contracting business. Petitioner thought that EUCC would have better productivity and performance by using nonunion labor, and he thought it would be advantageous to use Chicopee since it was a nonunion or open shop operation. Petitioner began to spend his working time with Chicopee in the hope that profits from Chicopee could be used to pay some of the EUCC debts. Contracts with the City of Fort Pierce and the City of Vero Beach were subcontracted to Chicopee. *132 [14] Chicopee also obtained its own electrical contracts and performed work on them, including a contract with Florida Power Corporation. Chicopee continued operations through May 1973, and in 1972 and 1973 was paid a total of $128,467.79 by Associates and EUCC. EUCC paid Chicopee a total of $38,245.18. Associates paid Chicopee a total of $90,222.61. Petitioner also made efforts to raise money for EUCC. In August of 1972 he assigned his rights to the New Jersey Zinc contract, which had an unpaid balance of $89,250, to the Peoples National Bank of Lawrenceville, Illinois, to secure a loan that Charles Carroll had earlier cosigned. [15]
In addition, petitioner continued to advance funds to EUCC. Between July 1 and December 31, 1972, petitioner advanced $242,856.92. *133 The source of the advances was primarily bank loans. Petitioner borrowed $105,000 from the National Bank of Malbourne and Trust Company in two loans on July 6, 1972 and August 29, 1972. Of this amount, petitioner advanced $100,000 to EUCC. Petitioner also borrowed $79,509.17 in three loans from the Barnett Bank of Cocoa N.A. These loans were dated July 31, August 4, and August 10, 1972. The loan dated August 4, 1972 in the amount of $24,962.50 was made jointly to petitioner and Charles Carroll. The proceeds of all three loans were deposited directly into the EUCC bank account. Between July 1, 1972 and December 31, 1972, petitioner was reimbursed $24,761.88, making his net unreimbursed advances during this period $218,095.04. The advances were used in part to pay current operating expenses and in part to pay off past indebtedness. Petitioner continued to make advances to EUCC in the period after June of 1972 even though he did not expect that the advances would ever be repaid by EUCC. Petitioner was a guarantor on the performance bonds provided by USF&G. He was concerned that if he did not continue to advance money to EUCC, the corporation would be unable to continue performance *134 on the projects, and petitioner would be called upon as guarantor. Petitioner also wanted to protect his business reputation since he planned to leave EUCC and planned to secure employment as an executive. Petitioner also did not want to leave Carroll, the co-guarantor, with responsibility for EUCC's debts. As of January 14, 1973, EUCC expected to incur losses of $259,459 on contracts with the City of Fort Pierce and Jacksonville Electric Authority. As of the same date EUCC expected to earn $162,779 on contracts with the City of Vero Beach and other Jacksonville Electric Authority contracts. As of January 14, 1973, petitioner thus expected a net loss on these contracts of $96,680, and the actual loss on these contracts turned out to be $90,851. By letter dated January 12, 1973, the First National Bank of Lakeland demanded immediate payment of four outstanding loans it had made to EUCC. After negotiation it was agreed that these four loans would be consolidated and extended, if additional security were provided. These outstanding loans were already secured by accounts receivable and contract rights of EUCC, and some of these loans themselves represented a consolidation and extension *135 of earlier loans. On December 27, 1972, EUCC had assigned to First National Bank of Lakeland all moneys due it under the Jacksonville Electric Authority contracts. The four loans were consolidated and renewed on March 5, 1973. The total balance of the four loans was $83,824.79 as follows: Loan
Date of
Original Loan
Outstanding Balance
Number
Original Loan
Amount
as of 3-05-73
4233
4-07-70
$71,879.95
$13,824.79
5073
4-28-72
20,000.00
15,000.00
5074
4-28-72
20,000.00
20,000.00
5160
6-15-72
35,000.00
35,000.00
TOTAL
$83,824.79
The additional security given at that time was an unconditional general guaranty by petitioner of EUCC's indebtedness and a second mortgage on petitioner's real estate located in Polk County, Florida. That real estate is also sometimes described as a warehouse located in Mulberry, Florida. EUCC as borrower also promised to give the bank a valid security interest "in all personal property and fixtures [of EUCC] wherever located and whether now owned or in existence or hereafter acquired or created, including goods, documents, general intangibles, chattel paper, accounts and contract rights…." Loans 5073, 5074, and 5160 had been guaranteed by petitioner when they were first made on April *136 28 and June 15, 1972, and the personal guarantee continued through each renewal. Loan No. 4233 was guaranteed by petitioner for the first time on March 5, 1973. As of that date of March 5, 1973, petitioner did not expect that he would ever be repaid by EUCC if he were ever called upon as guarantor to pay the bank. Around March 16, 1973, petitioner advanced $1,000 to EUCC. A petition for involuntary bankruptcy was filed against EUCC in April 1973. The petition alleged that three acts of insolvency or preference had occurred in 1972, including the fact that on December 27, 1972, the First National Bank of Tampa had caused a lien to be placed on equipment in the amount of $138,900, which lien had not been removed. Another lien in the amount of $75,000 had been placed on an International vehicle and a materialman's lien in the amount of $6,551 had been placed by Smith and Royals Electric Supply Company. On May 23, 1973, First National Bank of Lakeland, learning about the bankruptcy petition, seized $43,498.79, the entire balance in EUCC's checking account, and applied it to the bank's loans. Also in May 1973, First National Bank of Lakeland acquired all of the operating assets *137 of EUCC with the exception of some miscellaneous tools that had been transferred to Charles Carroll to allow him to finish EUCC's remaining contractual obligations. [16] The petition for involuntary bankruptcy was dismissed on June 15, 1973 pursuant to EUCC's earlier motion to dismiss.
EUCC was actually dissolved by proclamation of the State of Florida on May 23, 1973, and terminated its official existence at that time. The reason for termination by the State of Florida was for nonpayment of an annual Florida tax. D.J. Stark & Associates (Florida), Inc., was also dissolved by proclamation of the State of Florida and terminated its official existence on October 24, 1974. In 1974 petitioner sold his stock in Chicapee Associates, Inc. On September 12, 1973, the mortgaged warehouse in Mulberry, Florida, was sold by petitioners to Robert Nosum. The net proceeds of $30,584.53 from the sale were applied against the outstanding indebtedness of EUCC to First National Bank of Lakeland. On January 10, 1974, Charles Carroll, president of C.A. Carroll, Inc., received a check for $69,000 *138 as part payment for construction work completed on EUCC's Vero Beach job. The source of this money was an income tax refund petitioner had received. Petitioner ended his involvement with EUCC about May or June of 1973. Petitioner travelled outside the United States for a while, then returned to the United States to accept employment in Pennsylvania, and finally left the United States permanently in 1974. Petitioner's Federal income tax returns for 1972, 1973, and 1974 were prepared by Charles Faust. Petitioner's 1972 return was prepared from records that petitioner had furnished to Faust, including some cancelled checks and bank statements of EUCC and some bank statements and cancelled checks of petitioner. Faust did not have the EUCC corporate books and records. While Faust had some of the EUCC financial statements and the most recent trial balance, the EUCC ledger and journal were not available to Faust. The records that petitioner provided Faust and that were used to prepare petitioner's 1973 and 1974 Federal income tax returns were supplemented by information from third parties. Petitioner was working in Canada when the 1974 return was prepared, and Faust experienced *139 some delay in obtaining informtion from petitioner. The record does not indicate that Faust delayed in preparing the return once he received the information. The 1974 return was signed by Faust on November 11, 1975 and by petitioners on December 14, 1975. On their Federal income tax returns for 1972, 1973, and 1974, petitioners deducted $450,000, $117,037, and $157,193.11, [17] respectively, as "losses on advances to employer-corporation," EUCC. Respondent disallowed the deductions for each year, and also determined an addition to tax under section 6651(a) for the late filing of the 1974 return. The parties have now stipulated that the maximum net amount *140 of funds that petitioner paid to or for the benefit of EUCC before December 31, 1972 was $356,241.67. They have also stipulated that the maximum amount of funds that petitioner paid to or for the benefit of EUCC in 1973 was $32,584.53 [18] *141 and in 1974 $69,000. Respondent has conceded that on December 31, 1973, EUCC stock was worthless and the corporation had no liquidating value as of that date. ULTIMATE FINDINGS OF FACT 1. The unreimbursed advances to EUCC were in the amounts of $356,241.67 in 1972, $32,584.53 in 1973, and $69,000 in 1974, for a total of $457,826.20. 2. The entire $457,826.20 constituted contributions to capital rather than loans. 3. There was no reasonable cause for petitioners' failure to timely file their 1974 Federal income tax return. OPINION The principal issue for decision is whether certain advances made by petitioner to EUCC were loans or contributions to capital. If the advances were contributions to capital, they resulted in capital loss when the EUCC stock became worthless. Sec. 165(g). If the advances were loans, they resulted in ordinary loss if business related or in short-term capital loss if not business related in the year the debt became worthless. Sec. 166. Petitioner argues *142 that all advances before December 31, 1972 were bona fide business bad debts that became worthless in 1972. Respondent argues thta the advances were contributions to capital. Alternatively, respondent argues that if any of the advances were bona fide debts, they were nonbusiness bad debts rather than business bad debts and they did not become worthless until 1973. Respondent has conceded that the EUCC stock became worthless in 1973. Section 166(a)(1) allows a deduction to a taxpayer of any debt that becomes worthless within the taxable year. However, section 166(d) [19] *143 *144 provides that, in the case of a taxpayer other than a corporation, the loss from a nonbusiness bad debt shall be considered as a short-term capital loss which would be deductible only to the extent provided for in section 1211(b). Section 1.166-1(c), Income Tax Regs. provides that only a bona fide debt qualifies for purposes of section 166 and defines a bona fide debt as follows: A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. A gift or contribution to capital shall not be considered a debt for purposes of section 166. * * * Whether advances to a corporation are contributions to capital or bona fide debt is a question of fact. A.R. Lantz Co. v. United States,424 F. 2d 1330, 1334 (9th Cir. 1970); Gilbert v. Commissioner,262 F. 2d 512, 513 (2d Cir. 1959), affg. a Memorandum Opinion of this Court, cert. denied 359 U.S. 1002 (1959); Yale Avenue Corp. v. Commissioner,58 T.C. 1062, 1073 (1972). The basic determination of the question requires an evaluation of the risk that petitioner has undertaken. The question is whether petitioner had a reasoinable expectation of repayment regardless of the success of the business or whether his advances were put at the risk of the corporate venture. Gilbert v. Commissioner,248 F. 2d 399, 406 (2d Cir. 1957). [20] See also Fin Hay Realty Co. v. United States,398 F. 2d 694, 697 (3d Cir. 1968); Hambuechen v. Commissioner,43 T.C. 90, 99-100 (1964). *145 Among the multitude of factors that various courts have considered in determining whether shareholder advances are debt or equity are the under-capitalization of the corporation, the issuance of notes, the provision for and payment of interest, the presence of a maturity date, the intention of the parties, the name the parties apply to the transaction, the status of the shareholder-creditor as compared to other corporate creditors, the ability of the corporation to obtain loans from outside creditors, the fact of identity of interest between creditor and shareholder, and the right to participate in management. See e.g. Dillin v. United States,433 F. 2d 1097, 1100 (5th Cir. 1970); A.R. Lantz Co. v. United States,supra,424 F. 2d at 1333; Dixie Dairies Corp. v. Commissioner,74 T.C. 476, 493-494 (1980); *146 Smyers v. Commissioner,57 T.C. 189, 197-198 (1971); Hambuechen v. Commissioner,supra,43 T.C. at 99. No single factor is determinative of whether advances are risk investments in the corporation or debt. John Kelley Co. v. Commissioner,326 U.S. 521, 530 (1946). In this case almost all of the factors support respondent's contention that there was no bona fide debt. EUCC was in bad financial shape when petitioner first arrived on the scene and petitioner's advances to the corporation represented the corporation's only hope of survival. While petitioner thought that, by better management and more efficient administration, he could turn the company around and make it profitable, his only realistic hope for repayment of his advances depended upon his success in doing that. We conclude that petitioner was investing in the business, not just lending money that he expected EUCC to repay regardless of the success of the business. As of April 30, 1971, EUCC had trade accounts payable of $52,977.46, short term debt of $125,592.36, and long term debt of $30,826.01. That debt far exceeded the assets of the corporation. Capital stock was stated as $1,000. The May 1971 agreement between *147 EUCC and petitioner provided for petitioner to advance $30,000 interest free to EUCC which was to be repaid by October 15, 1971. After that date interest was to accrue at eight percent annually.Initially, EUCC may have executed notes to evidence indebtedness but, if so, those notes were not introduced in evidence and any practice of issuing any such notes was short lived. The agreement also provided that any advances in excess of the initial $30,000 were to be due in not more than three years and were also to accrue interest at eight percent. Thus, the original agreement provided for payment of interest and had a maturity date that could be determined.In practice, however, there was no indication that any interest was ever paid to petitioner or that any interest was even accrued on the EUCC books. Aside from the general maturity date of "no more than three years," there was no fixed schedule of repayment and EUCC made repayments in varying amounts at irregular intervals. Moreover petitioner was the only person to decide whether repayments would be made to him.
When petitioner took over management of EUCC in May of 1971, most if not all of EUCC's assets, including accounts receivable, *148 inventory, and equipment, had already been pledged to secure EUCC's debt. Petitioner arranged extensions of the outstanding debts and succeeded in placing some of EUCC's bank creditors on extended payment schedules. The accounts payable were also placed on an agreed payment schedule. He also agreed with those creditors that he would use corporate earnings to pay off past indebtedness. None of petitioner's advances were secured so in fact petitioner was subordinated to all of the other creditors. Thus, it is clear that when petitioner first became involved with EUCC, the corporation's financial condition was such that petitioner could have expected to be repaid only through the success and future earnings of the corporation. This is indicative of a contribution to capital rather than a bona fide loan. Diamond Bros. Co. v. Commissioner,322 F. 2d 725 (3d Cir. 1963), affg. a Memorandum Opinion of this Court; Yale Avenue Corp. v. Commissioner,supra,58 T.C. at 1075. Petitioner has suggested that initially EUCC did have success and that he was in fact repaid some of his advances, a factor that could support petitioner's argument that his advances created a bona fide indebtedness. *149 Diamond Bros. Co. v. Commissioner,supra. However, the advances and repayments simply show that petitioner advanced money to EUCC when it was needed and withdrew money from the corporation when and as he could. Any repayments were in varying amounts, at irregular intervals, without interest, and far fewer than the advances. While petitioner's total advances up to December 31, 1972 amounted to $440,346.32, the repayments over that entire period amounted to only $84,104.65, for net advances of $356,241.67. Petitioner dealt with his wholly-owned corporation as an owner, not as a creditor. The strongest factor supporting petitioner's position is that when he first began his involvement with EUCC, he was not a shareholder. However, that lasted only until August 1971. The May 1971 agreement gave petitioner the option to purchase 100 percent of the stock of EUCC in exchange for petitioner's promise to advance EUCC money for working capital. Petitioner argues that this agreement was made at arms length and before petitioner had any ownership interest in EUCC. Respondent argues that even though petitioner did not technically own any EUCC stock, he had all of the powers of a 100 percent *150 shareholder. Petitioner was elected chairman of the board of directors of EUCC and he was given complete and final control over all fiscal matters of the corporation. Petitioner's power to control the operations of EUCC was thus complete. Petitioner argues that he did not intend to take a shareholder's risk at the time he began to make advances to EUCC. He argues that it was entirely possible that he would decide not to exercise his option to purchase the EUCC stock. In that event he would have had a valid and enforceable right to be repaid by EUCC.Respondent characterizes this factor as merely providing for the return of capital upon withdrawal from an investment by an investor rather than an indication of a bona fide loan. Petitioner may have the better side of the argument with respect to this single factor, but we are mindful that all of the facts and circumstances must be considered and that no single factor is decisive. See John Kelley Co. v. Commissioner,supra.
This factor may suggest that at least the advances up to August 27, 1971, the date on which petitioner exercised his option and became the sole shareholder, should be treated as loans rather than contributions *151 to capital. The net amount of unreimbursed advances in the period from May 21 through August 27, 1971, was $78,500. The total repayments during that same period were $20,000. The May 1971 agreement provided, however, that: The option to purchase stock as provided herein shall terminate on October 31, 1971, provided that Stark has been reimbursed for the $30,000.00 advanced or otherwise contributed to EUCC, or due him as compensation or interest, and the option to purchase the stock of EUCC by Stark as provided herein shall be extended until such advances, loans or other financial contribution by Stark to EUCC shall have been repaid in full. Thus, petitioner's exercise of the option at an early date, long before repayment and before any possible expiration of that option, suggests to us that all of petitioner's contributions were put at the risk of the business and were not loans. In any event, there are no facts suggesting that the advances before August 27, 1971 were in any way different from those made after that date. Therefore, we do not treat the advances before August 27, 1971 as loans. Considering the fact of the thin capitalization of EUCC, the fact that few, if any, *152 notes were executed and none were produced, the fact that EUCC did not pay or accrue interest on its books, the absence of a fixed maturity date, petitioner's de facto subordination to other creditors, and his right to fully control and manage the operations of the corporation, we hold that all advances made by petitioner to EUCC up to July 1, 1972, were contributions to capital and not bona fide loans. With respect to advances made after that date, petitioner has conceded that he had no expectation of repayment of any of those advances.No deduction is allowable if at the time of acquiring the debt the taxpayer has no reasonable expectation of repayment of the sums advanced. Arrigoni v. Commissioner,73 T.C. 792, 799 (1980); Thompson v. Commissioner,22 T.C. 507, 517 (1954); Hoyt v. Commissioner,145 F. 2d 634 (2d Cir. 1944). There is an exception to this general rule when a guarantor is forced to pay on his guarantee, and then the worthlessness of the debt upon acquisition does not necessarily preclude a bad debt deduction. Putnam v. Commissioner,352 U.S. 82, 85 (1956). Here, petitioner argues that under the doctrine of Putnam v. Commissioner,supra, the advances were bona fide *153 debts that became worthless because they were made pursuant to the surety agreement he had signed with USF&G. In Putnam v. Commissioner,supra, the Supreme Court held that when payments were made pursuant to a shareholder's obligation as a guarantor of the corporation, the corporation's obligation to the creditor became an obligation to the guarantor by subrogation which upon payment instantly became a worthless debt. 352 U.S. at 85. Thus, the proper time for determining whether the taxpayer had a reasonable expectation of repayment was when the guarantee was made rather than when the money was paid. Arrigoni v. Commissioner,supra;Markle v. Commissioner,17 T.C. 1593, 1598 (1952); Hoyt v. Commissioner,supra.
On November 4, 1971, petitioner, his wife, Charles A. Carroll, and Ida D. Carroll signed an agreement making them sureties with respect to all bonds that USF&G executed for EUCC. Considering the amount of EUCC's outstanding debts at that time, we think petitioner could not have reasonably expected to be repaid by EUCC if he were ever called upon by USF&G to pay on his guarantee. Petitioner argues, however, that he made advances to EUCC after mid-1972 to permit EUCC to *154 continue performing its contracts thereby minimizing the chance that petitioner would ever be called upon by USF&G. No evidence was presented to show that USF&G had ever demanded payment of EUCC and been refused. While the SUF&G presence hovers over this case, the record is singularly devoid of any information as to what, if anything, petitioner and his co-guarantor were ever called upon to do. There is no evidence that petitioner ever made any payments under his guarantee. All of the payments in this case were made to or for the use of EUCC. While petitioner certainly had potential liability to USF&G which may have been reduced by his advances to EUCC, petitioner has not shown that his advances discharged any obligation to USF&G. Thus, for all the reasons discussed above, petitioner is not within the exception of Putnam v. Commissioner,supra.[21] *155 After EUCC had ceased operations and after its corporate existence had been terminated by the State of Florida, petitioner continued to make a few additional payments to or for the benefit of EUCC. Clearly, there was no expectation of repayment and those payments did not constitute loans to EUCC. On September 12, 1973, petitioner's warehouse in Mulberry was sold and the net proceeds from the sale of $30,584.53 were applied against the outstanding indebtedness of EUCC to First National Bank of Lakeland. These funds must also be viewed as a contribution to the capital of EUCC.In 1974 petitioner paid Charles Carroll $69,000. The source of this payment was a Federal income tax *156 refund that petitioner received on January 2, 1974. The money was paid to Carroll for construction work on EUCC's Vero Beach job.While petitioner suggested that he reimbursed Carroll for money that Carroll had spent pursuant to the master surety agreement with USF&G, Carroll was a co-guarantor under that agreement. Again there is no evidence to show that Carroll paid this amount or any other amount pursuant to the surety agreement. In light of the parties' stipulation that this money was paid for the benefit of EUCC, we hold that this $69,000 payment was also a contribution to capital. Petitioner's cointributions to capital totalled $457,826.20, and that increased his basis in his EUCC stock. Sec. 1016. Respondent has conceded that the EUCC stock became worthless in 1973. Thus, petitioner is entitled to a deduction for worthless stock under section 165(g). Since we have decided that the advances petitioner made to EUCC were contributions to capital and not bona fide debts, we do not reach the issue as to whether they were business or nonbusiness bad debts within the meaning of section 166. [22] *157 Respondent has determined that petitioner is liable for an addition to tax as provided in section 6651(a)(1). Section 6651(a)(1) provides for an addition to tax for failure to file a return when it is due "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." Petitioner has the burden of proof with respect to this issue. Electric & Neon, Inc. v. Commissioner,56 T.C. 1324, 1342 (1971), affd. without published opinion 496 F. 2d 876 (5th Cir. 1974); Fischer v. Commissioner,50 T.C. 164, 177 (1968); Bebb v. Commissioner,36 T.C. 170, 173 (1961). Section 301.6651-1(c)(1), Proced. & Admin. Regs., provides in part "If the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time, then the delay is *158 due to a reasonable cause." Petitioner's 1974 tax return was prepared by Charles Faust.Petitioner was working in Canada when the return was prepared and Faust had a difficult time getting the financial information necessary to prepare the return. While petitioner provided most of the information, some of the information necessary to prepare the return was obtained from third parties. This evidence is insufficient to show that the late filing of petitioner's 1974 Federal income tax return was due to reasonable cause. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years here involved, unless otherwise indicated.↩
2. The 1969 deficiency is based on an alleged operating loss carryback of $430,779.26 from 1972. Petitioners had been allowed a refund of $75,586.36 for taxable year 1969 as a result of their filing an Application for a Tentative Refund from Carryback of Net Operating Loss (Form 1045). The 1974 deficiency results in part from a 1973 net operating loss carry forward. Of the $103,581.88 net operating loss deduction claimed for 1974, petitioners have conceded $86,452.47 of that amount, leaving in dispute only $17,129.41.↩
3. On or about March 13, 1973, respondent granted petitioners an extension of time to June 15, 1973, for filing their 1972 return. On July 11, 1973, respondent granted petitioners another extension of time to July 13, 1973, for filing this return, but the return was not filed until November 26, 1973. On April 15, 1974, petitioners were granted an extension of time to June 15, 1974, for filing their 1973 tax return, but the return was not filed until April 18, 1975.
4. Although petitioner testified that in 1971 he was not the 100 percent owner but later acquired all of the Chicopee stock in 1971 and 1972, that testimony is contrary to the parties' stipulation of facts. We have relied upon the stipulation, because petitioner's testimony as a whole demonstrated a poor grasp of details and a lack of specific knowledge and information, particularly as to figures and dates.↩
5. While the record establishes that petitioner wanted a new source of income and did not want to continue the extensive travel that he had engaged in in his earlier career, the record does not establish that petitioner was seeking this income in the form of salary. We have accorded little weight to petitioner's self-serving testimony that he was seeking salary, because it is not borne out by the objective evidence of record.↩
6. The amount of this Internal Revenue Service lien was stated as $19,526.43 in the minutes of a special meeting of EUCC shareholders dated May 18, 1971; as $24,404 in an agreement among petitioner, EUCC, and J. G. Carr dated May 17, 1971; and as $18,870.29 in an EUCC operations report for June 1971. The reason for the varying amounts is not apparent to us, but it may involve penalties and interest on the unpaid taxes.↩
7. In the agreement Carr represented that "he either owns or can obtain 100 percent of the stock in EUCC." That same day, May 17, 1971, there was another agreement among Lord, Carr, EUCC, and petitioner, whereby all parties acknowledged EUCC's obligation to Lord in the amount of $35,750 and Lord extended the payment schedule on the promissory notes securing that indebtedness and also released his option to acquire the EUCC stock.
8. Included in the $98,500 was a transfer from petitioner to EUCC on May 21, 1971 of equipment worth $7,000.↩
9. Petitioner's wife, Anna Stark, and Ida D. Carroll also signed the Master Surety Agreement.
*. The statements for the months so marked did not include any provision for Federal income taxes. It was anticipated that a substantial operating loss carryover would more than offset current earnings. ** Items so marked include a limited provision for Federal taxes.↩
10. This return was also prepared by Charles Faust.↩
11. There were three loans as indicated: ↩
Amount
Date Granted
Loan Number
$20,000
April 28, 1972
5073
20,000
April 28, 1972
5074
35,000
June 15, 1972
5160
12. Petitioner testified that in late May 1972, Shulman, the comptroller, in "a very dramatic moment" showed him between $150,000 and $200,000 of invoices that Shulman allegedly had not posted as accounts payable. According to petitioner, Shulman had not posted the invoices because it would have made the relationship between the accounts receivable and the accounts payable alarming to the bank, and the bank might then have been unwilling to continue a line of credit for EUCC. Shulman, however, had been employed by EUCC only since April 1972, at the earliest. Considering the level of accounts payable as stated in most of EUCC's monthly reports, we think it unlikely that Shulman could have failed to post $150,000 to $200,000 of invoices in a brief period of at most two months. Shulman did not testify at the trial, and we did not find petitioner's testimony about the "dramatic moment" credible. However, there no doubt were large numbers of unpaid accounts payable that had accumulated.
13. The contract was dated July 21, 1972. Because of the nature of the bidding process, however, EUCC had been required to keep its bid open for acceptance for a certain period of time and therefore had been locked in at a much earlier date.↩
14. Chicopee, as early as August of 1972, transferred the Fort Pierce contract to Southern Powerline Construction.↩
15. At first the New Jersey Zinc contract rights were assigned to the Barnett Bank of Cocoa N.A. as security for the loan. The interest rate at the Peoples National Bank of Lawrenceville was lower so the transaction was transferred there, the transfer being suggested by Faust who was a director of the Lawrenceville bank.↩
16. The bank also seized $204.57 from the EUCC payroll account on October 31, 1973 and credited it to the loans.↩
17. On their 1974 return petitioners claimed a deduction for "loss on 1974 advances to employer corporation" of $157,193.11. Petitioners alleged that this sum was advanced to EUCC in the form of proceeds from the sale of 35,000 shares of Earth Science stock during 1974 which was owned by petitioner. Respondent has disputed that any of this money was advanced to EUCC. No evidence was introduced to support petitioner's allegation. Furthermore, the parties have stipulated $69,000 as the maximum advances to EUCC by petitioner in 1974.↩
18. This is the figure in paragraph 36(b) of the parties' supplemental stipulation and the Court so finds. It is possible, as respondent argues on brief, that the figure should be $31,584.53, consisting of the $30,584.53 net proceeds from the sale of petitioners' warehouse located in Mulberry, Florida, and the $1,000 advanced to EUCC on March 16, 1973. However, in their briefs, both parties at various times try to vary the terms of their stipulations while at other times accusing the opposing party of attempting to do the same thing. None of EUCC's accounting books and records of original entry are in evidence. The financial records in evidence are secondary materials, which are incomplete, fragmentary and at times inconsistent with each other. The Court cannot reconcile the conflicts between the stipulations and the documentary materials and thus has held the parties strictly to their stipulations. The Court declines petitioners' invitation to find that the advances were in amounts greater than the stipulated figures. The Court likewise declines respondent's invitation to find that the repayments were in amounts greater than the stipulated figures.
19. Section 166 provides in pertinent part: SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly Worthless Debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially Worthless Debts.--When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. (b) Amount of Deduction.--For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.
(d) Nonbusiness Debts.-- (1) General Rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness Debt Defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. (e) Worthless Securities.--This section shall not apply to a debt which is evidenced by a security as defined in section 165(g)(2)(C).
20. On appeal of our decision in Gilbert v. Commissioner,T.C. Memo. 1956-137, the Second Circuit remanded the case for further consideration. On remand we made certain additional findings of fact in support of our holding that the advances were contributions to capital. T.C. Memo. 1958-8. This decision was also appealed and was affirmed by the Second Circuit. 262 F. 2d 512↩ (2d Cir. 1959).
21. Petitioner also seems to argue that he comes within the business necessity exception where payments giving rise to the debt were not required by a guarantee but were nonetheless involuntary in the sense that they were necessary in the exercise of sound business judgment to protect existing property rights of his own separate business. Arrigoni v. Commissioner,73 T.C. 792, 799-800 (1980); Martin v. Commissioner,38 T.C. 188 (1962). Petitioner says that he had to pay EUCC's debts to protect his own business reputation. However, a corporation's business is not the business of the shareholder. Whipple v. Commissioner,373 U.S. 193 (1963). And petitioner cannot suggest, on the facts of this case, that the advances were made in connection with his trade or business of being a corporate executive. United States v. Generes,405 U.S. 93↩ (1972).
22. Under the dominant motivation test of United States v. Generes,405 U.S. 93 (1972), any such debt would have been a nonbusiness debt. Since petitioner received salary on only one occasion ($12,000 in 1971), it would be difficult to find that "loans" of $457,826.20 in 1972, 1973, and 1974 were to protect his salary as a corporate executive. We think it is clear that petitioner merely invested in a business that failed; he was not lending money to protect his job.