TOWNE SQUARE, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Towne Square, Inc. v. Commissioner
Docket No. 12850-79
United States Tax Court
T.C. Memo 1983-10; 1983 Tax Ct. Memo LEXIS 773; 45 T.C.M. (CCH) 478; T.C.M. (RIA) 83010; January 10, 1983. Thomas G. Hull (an officer), for the petitioner. Vallie C. Brooks, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioner's Federal income tax for the taxable year ended June 30, 1976, in the amount of $12,580.83. The issue for decision is whether petitioner-corporation is entitled to an interest expense deduction under section 163(a). [1] Resolution of this issue depends upon whether the incorporating shareholders' 1968 advances to petitioner are considered bona fide loans or contributions to capital. *774 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, Towne Square, Inc., is a corporation which was organized under the laws of the State of Tennessee on July 17, 1963. At the time the petition was filed in this case, petitioner's principal place of business was in Greeneville, Tennessee. Petitioner filed its Federal income tax return in accordance with an accrual method of accounting and on the basis of a fiscal year ended June 30. Petitioner filed its income tax return for taxable year ended June 30, 1976, with the Internal Revenue Service Center at Memphis, Tennessee. A. C. Broyles, Jr. ("Broyles"), and H. J. Lamons, Jr. ("Lamons"), organized petitioner-corporation for the purpose of developing and operating a shopping center in Greeneville, Tennessee. At the time of incorporation, petitioner's corporate charter authorized the issuance of 500 shares of capital stock, each with a $100 par value. Petitioner issued 100 shares of its capital stock on July 23, 1963; Broyles received 51 shares and Lamons received 49 shares. [2]
*775 Petitioner-corporation encountered financial difficulties from its inception, which petitioner's shareholders attribute to their inexperience in the development and management of shopping centers. The financial problems commenced with Broyles' and Lamons' expensive method of obtaining property on which to build the shopping center. Rather than initially obtaining several fixed-price options to purchase adjoining parcels of land, Broyles and Lamons acquired the required property by purchasing a parcel at a time. Broyles and Lamons purchased one piece of land in July 1963, for $30,000, including an $8,700 downpayment and promissory notes for $21,300. Broyles and Lamons purchased another parcel in August 1963, for $11,000, including a $2,725 downpayment and promissory notes in the amount of $2,725. [3]
*776 On April 12, 1965, petitioner's board of directors adopted a resolution to amend petitioner's corporate charter; the amendment increased the maximum number of authorized shares of capital stock from 500 shares to 2,500 shares, each with a $100 par value. Petitioner issued 435 shares to Broyles and 135 shares to Lamons. Broyles and Lamons transferred previously acquired real estate in exchange for petitioner's newly issued capital stock; petitioner's board of directors declared that the value of the real estate equaled the par value of the stock issued to the shareholders.[4]
Until 1965, petitioner was unable to raise funds from outside sources to cover its pre-construction and construction expenses. In may 1965, petitioner received a $70,000 line of credit from the First National Bank, Greeneville, Tennessee. On June 25, 1965, petitioner-corporation obtained a commitment for a construction loan in the amount of $832,000 from Wachovia *777 Bank and Trust Company of North Carolina. Actual construction of the shopping center commenced in August 1965, and was substantially completed by August 1966.
Petitioner's indebtedness increased in 1966 as a result of mounting construction expenses. Petitioner unsuccessfully attempted obtain long-term permanent financing to cover its building costs. [5] Until permanent financing could be located, petitioner borrowed $50,000 from Greene County Bank, Greeneville, Tennessee, at an interest rate of 6 percent; this loan was evidenced by petitioner's promissory note. Additionally, petitioner arranged for its $40,740.85 outstanding debt to Malone Brothers Construction Company to be repaid on a basis of $1,000 per month plus interest; petitioner issued a promissory note to evidence this indebtedness. During 1967, petitioner-corporation temporarily resolved some of its financial problems. On January 26, 1967, petitioner obtained permanent financing from Commonwealth *778 Life Insurance Company, Louisville, Kentucky, in the amount of $785,000, payable over 17 years at 6 percent. Petitioner secured this loan by a first deed of trust on the shopping center and a conditional assignment of shopping center rents. Additionally, several creditors that had contributed to the shopping center's construction demanded payment for their services. Petitioner agreed to several financing arrangements, including a $50,000 mechanic's lien in favor of Bob Smith Construction, Inc., and a $157,000 note, secured by a second deed of trust and second conditional assignment of shopping center rents, in favor of Volunteer Natural Gas Company. Petitioner also arranged with the First National Bank of Greeneville, Tennessee, to execute a promissory note, secured by a third deed of trust for the purpose of renewing an outstanding $59,167 loan and obtaining additional funds of $61,320. Moreover, petitioner-corporation's board of directors authorized a $45,000 loan from Parks-Belk Company of Greeneville, Tennessee; this indebtedness was to be evidenced by a corporate promissory note endorsed by Broyles, Lamons, and their wives, and secured by a second mortgage on real estate controlled *779 by the endorsers and a security agreement covering certain personal property of the endorsers. Petitioner experienced cash flow difficulties in 1968. Petitioner's income from shopping center rents was insufficient to cover petitioner's expenses. This dilemma resulted from petitioner's having set rents at law rates, from arrearages in rental payments by several tenants, and from higher than anticipated shopping center construction costs. In an attempt to remedy this situation, Broyles and Lamons made advances to petitioner, and in exchange, petitioner issued non-interest-bearing promissory notes as follows: Date of Note
Creditor
Term
Amount
July 1, 1968
A. C. Broyles &
[6]Broyles-Milner, Inc. 1 yr.
$ 67,599.24
July 1, 1968
A. C. Broyles, Jr.
1 yr.
2,957.93
July 1, 1968
A. C. Broyles, Jr.
1 yr.
95,312.36
July 1, 1968
H. J. Lamons, Jr.
1 yr.
56,797.26
Total
$222,666.79
Broyles and Lamons hoped that their funds would eventually enable petitioner to obtain a long-term loan of sufficient amount to repay them. In 1969, *780 petitioner faced a deteriorating financial condition. Volunteer Natural Gas Company threatened foreclosure on its second deed of trust and Commonwealth Life Insurance Company had exercised its right to collect the shopping center rents. In an effort to raise new capital, petitioner sold more of its capital stock. On May 22, 1969, R. R. Bewley ("Bewley") purchased 1,146.5 shares of petitioner's capital stock and one-half of the promissory notes due Broyles and Lamons; Bewley paid $45,000. [7] On or about August 8, 1969, Broyles sold 582.5 of his shares of petitioner's stock to Messrs. Hull, Kelley, Hite and Brooks; similarly Bewley sold 288.5 shares to the same individuals.During these sales transactions each of the four new shareholders received a share of petitioner's indebtedness to Broyles and Lamons in an amount equal to his proportionate interest in petitioner's outstanding capital stock. Messrs. Hull, Kelley, Hite and Brooks paid Bewley $10,770 and paid Broyles $18,425 to consummate these transactions. [8]
*781 In addition to the sale of petitioner's capital stock and the distribution of petitioner's promissory notes to its new shareholders, during 1969 petitioner received a new advance from a shareholder and repaid several obligations. Broyles advanced petitioner an additional $27,308.08. This amount was not evidenced by a promissory note. On or before June 30, 1969, petitioner-corporation repaid to Lamons $1,500, and petitioner utilized approximately $19,000 of the shareholders' advances to compensate its architects and repay a portion of its debt to Bewley. On or before June 30, 1969, petitioner also paid $4,283.50 to Home Federal Savings and Loan in payment of a personal obligation of Broyles. Petitioner's board of directors reviewed the corporation's finances on June 23, 1971. If found that petitioner remained liable on the following outstanding indebtedness: Balance
Creditor
Outstanding
Comments
1. Commonwealth Life
Insurance Company
$650,000.00
Security is a first
deed of trust against
the shopping center
property and first
conditional assignment
of rents.
2. Bob Smith Construction
Company
44,400.00
Security is a mechanic's
lien evidenced by a
judgment in Chancery
Court.
3. Fifteen individuals
169,933.15
Original debt to Volunteer
Natural Gas Company;
Security is a second
deed of trust against
the shopping center real
estate and a second
conditional assignment
of rents.
4. Home Federal Savings
and Loan Association
Broyles' personal debt
on which the corporation
has given a third
conditional assignment
of rental as security.
5. First National Bank,
Greeneville, Tennessee
114,900.19
Security is a third deed
of trust.
6. Tennessee Department
of Revenue
15,000.00
Due for franchise and
excise taxes.
7. Greene County Bank
51,658.35
Promissory note is
endorsed by Frank
Lamons' Estate and H. J.
Lamons, Sr's Estate 8. Greene County Bank
$ 30,995.01
Note endorsed by
White Stores.
9. R. R. Bewley
8,500.00
R. R. Bewley advanced
this sum to pay the
first installment due
to Bob Smith Construction
Company.
10. H. J. Lamons, Jr.
1,500.00
Lamons advanced this
amount as partial payment
of the first
installment due to Bob
Smith Construction
Company.
11. Honeycutt & Boyd
30,000.00
Honeycutt & Boyd will
settle for $6,500.
12. Parks-Belk
75,130.38
Parks-Belk will settle
for $25,000.
13. Taylor and Rogan
Attorneys at Law
20,000.00
Taylor and Rogan will
settle for $10,000.
14. Greene County Bank
9,332.50
Parks-Belk Company has
secured this note.
15. M & M Supply Company
Amount
Unknown
This is a liability in
dispute; litigation is
pending in the Court of
Appeals at Knoxville,
Tennessee.
16. Bewley, Broyles, Hull,
Hite, Kelley and Lamons
249,974.87
Accrued interest on these
(Principal
promissory notes at an
amount)
annual rate of 7 percent
totals $51,554.63.
*782 The board of directors determined that petitioner's liability to its shareholders was no longer evidenced by valid, unexpired promissory notes and decided to issue new promissory notes to the shareholders. The notes totaled $301,529.50, which equaled the prior principal amount of $249,974.87 plus accrued interest of $51,554.63. These promissory notes were secured by a third deed of trust on the shopping center real estate. The schedule below reflects the capital stock ownership in petitioner as of June 30, 1971, and the amount of each renewal promissory note that petitioner issued to its shareholders: Percent of
Amount of
Note
Stockholder
No. Shares
Stock Owned
Note
Percentage
R. R. Bewley
858
37.4%
$112,827.00
37.4%
H. J. Lamons, Jr.
334
14.6%
43,921.00
14.6%
Thomas C. Hull
269
11.7%
35,373.50
11.7%
Howard S. Kelley
218
9.5%
28,667.00
9.5%
Paul Hite
218
9.5%
28,667.00
9.5%
Buel D. Brooks
217
9.5%
28,535.50
9.5%
A. C. Broyles, Jr.
179
7.8%
23,538.50
7.8%
Total
2,293
100.0 $301.529.50
100.0 The board of directors additionally decided that if petitioner obtained a $500,000 loan, it would be able to repay *783 all outstanding obligations with the exception of its debts to Commonwealth Life Insurance Company, M & M Supply Company and its shareholders. Therefore, petitioner borrowed a total of $500,000 from six shareholders in exchange for promissory notes and a second deed of trust on the shopping center's real estate. Petitioner's promissory notes bore interest at an annual rate of 7-1/2 percent and were distributed as follows: Shareholder
Amount
Bewley
$200,000
Lamons
82,000
Hull
68,000
Kelley
50,000
Hite
50,000
Brooks
50,000
After these refinancing transactions were completed, the petitioner's indebtedness included: Obligee
Amount
Security
Commonwealth Life
Insurance Company
$650,000.00
First deed of trust and
first conditional assign-
of rents
Bewley
200,000.00
Second deed of trust
112,827.00
Third deed of trust
Lamons
82,000.00
Second deed of trust
43,921.00
Third deed of trust
Hull
68,000.00
Second deed of trust
35,373.50
Third deed of trust
Kelley
50,000.00
Second deed of trust
28,667.00
Third deed of trust
Hite
$ 50,000.00
Second deed of trust
28,667.00
Third deed of trust
Brooks
50,000.00
Second deed of trust
28,535.50
Third deed of trust
Broyles
23,538.50
Third deed of trust
M & M Supply
Amount Unknown
*784 From summer 1969 through 1972, Bewley supervised petitioner's shopping center operations and negotiated leases with tenants. Bewley did not receive compensation for his management services until petitioner's board of directors voted on August 17, 1972, to compensate Bewley at a rate of $1,000 annually. This low rate of compensation reflected petitioner's poor financial condition. On June 16, 1975, the stockholders held a meeting to review petitioner's financial condition. The stockholders concluded that petitioner's finances limited its ability to repay its outstanding promissory notes, real estate taxes, and internal revenue taxes. The stockholders then authorized the employment of an M.I.A. appraiser to appraise the shopping center real estate for potential sale value. On or about July 12, 1976, petitioner obtained a loan from Greene County Bank of Greeneville, Tennessee, in the amount of $400,000. Petitioner issued to the Greene County Bank a promissory note for $400,000, payable at a rate of $20,000 annually for four years with the entire balance due in the fifth year and interest at 9 percent annually. The promissory note was secured by a second deed of trust on the *785 shopping center property and a conditional assignment of shopping center rentals. Petitioner used the funds borrowed from Greene County Bank to repay its promissory notes which were held by its shareholders and were secured by a second deed of trust. During this same board meeting, the board of directors determined that petitioner should execute a renewal note to each of its shareholders for the principal and interest amounts outstanding on its June 30, 1971 promissory notes, which were secured by a third deed of trust on petitioner's real estate. These renewal promissory notes, with total principal amount of $433,034.50, bearing interest at a rate of 9 percent annually, and due date in July 1981, were distributed as follows: Shareholder
Amount
Bewley
$162,128   Lamons
63,054   Hull
50,783.50
Kelley
41,155   Hite
41,155   Brooks
40,966.50
Broyles
33,792.50
The shareholders continued to have a third deed of trust on the shopping centers real estate as security. By June 30, 1977, petitioner's financial condition had not changed dramatically. Petitioner had not paid any interest on its outstanding obligations to its shareholders nor *786 did it have sufficient cash from rentals to pay any portion of these obligations at that time. However, petitioner had sufficient funds to make the principal and interest payments due on its promissory note secured by a first deed of trust, as well as the payments due on several notes secured by second deeds of trust. Throughout the period of 1963 through 1979, petitioner-corporation incurred substantial current and long-term liabilities and sizable operating deficits. Petitioner's periodic financial statements are reproduced below in condensed form. BALANCE SHEET
June 30,
June 30,
1969
1971
Assets
Current
$ 6,800.35 $ 47,311.41 Fixed
1,602,873.54 1,486,968.76 Deferred Charges
27,661.15 23,723.13 Total Assets
$1,637,335.04 $1,558,003.30 Liabilities
Current
$ 330,194.65 $ 54,088.76 Mortgage and Notes
Payable (Not to
Shareholders) due
after 12 months
895,642.23 614,681.50 Advances by Shareholders
and other liabilities
270,494.42 749,974.87 Liabilities due within
12 months
Capital
Capital Stock
229,300.00 229,300.00 Retained Earnings (Deficit)
[9] (88,296.26)
(90,041.83)
Total Liabilities
$1,637,335.04 $1,558,003.30 *787 June 30,
June 30,
1976
1979
Assets
Current
$ 34,798.59 $ 7,931.88 Fixed
1,340,846.56 1,261,254.56 Deferred Charges
13,878.08 8,395.79 Total Assets
$1,389,523.23 $1,277,582.23 Liabilities
Current
$ 80,335.80 $ 184,812.94 Mortgage and Notes
Payable (Not to
Shareholders) due
after 12 months
400,097.31 634,592.51 Advances by Shareholders
and other liabilities
833,034.50 446,034.50 Liabilities due within
12 months
(90,681.55)
Capital
Capital Stock
229,300.00 229,300.00 Retained Earnings (Deficit)
(153,244.38)
(126,476.17)
Total Liabilities
$1,389,523.23 $1,277,582.23 INCOME/LOSS STATEMENT
June 30,
June 30,
1969
1971
Income
$139,814.99 $141,879.60
Expenses
142,418.01 138,066.43
Profit (loss) Before Extraordinary
Items
(2,603.02)
3,813.17
Extraordinary Items
[10] 2,500.00
Net Income (Loss)
($2,603.02)
$ 6,313.17
*788 June 30,
June 30,
1976
1979
Income
$109,155.75 $210,642.75 Expenses
82,975.03 112,757.72 Profit (loss) Before Extraordinary
Items
26,180.72 97,885.03 Extraordinary Items
[11] (179,425.10)
[12] (83,005.86)
Net Income (Loss)
($153,244.38)
$14,879.17 During the latter part of 1979, petitioner sold its shopping center to Towne Square, Ltd., a limited partnership, composed of some of the children of the shareholders of petitioner-corporation. The sales price was $1,050,000, which included the limited partnership's assumption of the first deed of trust on the property in the amount of $294,592.51, the second deed of trust note to Greene County Bank in the amount of $340,000, and the third deed of trust notes to petitioner's shareholders to the extent of $415,407.49.The selling price of the shopping center was based on a 1979 M.I.A. appraisal of $1,063,000. On its Federal income tax return filed for the taxable *789 year ended June 30, 1976, petitioner claimed a deduction for interest in the amount of $83,054.18, of which $28,539.75 represented interest accrued during that taxable year on petitioner's financial books with respect to its renewal promissory notes which were secured by a third deed of trust and were held by its shareholders. Petitioner additionally claimed a net operating loss carryover deduction in the total amount of $54,104.48, which included prior taxable years' interest expenses on the promissory notes due its shareholders. [13] Petitioner claimed the interest expense and net operating loss as below: Claimed interest
Income or (loss)
Claimed net operating
Fiscal Year
expense to
reported in
loss after interest
Ending
shareholders
tax return
deduction to shareholder
June 30, 1971
$20,475.13
$6,313.17 ($14,161.96)
June 30, 1972
21,877.49
17,899.13 (3,978.36)
June 30, 1973
23,378.01
25,165.64 June 30, 1974
24,983.68
(10,980.58)
(35,964.16)
*790 The respondent disallowed petitioner's claimed deductions with the explanations that: (a) The deduction of $83,054.18 shown in your return as interest is reduced by $28,539.75 because it has not been established that the $28,539.75 represents interest on bona fide debts. Consequently, your taxable income for the taxable year ended June 30, 1976, is increased $28,539.75. (b) The claimed net operating loss deduction of $26,180.72 in the fiscal year ending 6/30/76, from alleged net operating losses of $14,161.96, $3,978.36 and $35,964.16 in fiscal years ending 6-30-71, 6-30-72, and 6-30-74, respectively, is unallowable because it has not been established that you are entitled to any of the claimed net operating loss for the year ending 6-30-76. Accordingly, taxable income for the taxable year ended June 30, 1976, is increased by the claimed deduction of $26,180.72 and there is no net operating loss carryover available to subsequent years. OPINION Whether the transfer of funds to a corporation by its incorporating or dominant shareholders establishes a debtor-creditor relationship *791 is a question of fact. Gooding Amusement Co. v. Commissioner,236 F.2d 159 (6th Cir. 1956), affg. 23 T.C. 408 (1954); John Wanamaker, Philadelphia v. Commissioner,139 F.2d 644 (3rd Cir. 1943), affg. 1 T.C. 937 (1943). A genuine debtor-creditor relationship depends upon the intent of both parties at the time that the purported debt is created. Gooding Amusement Co.,supra;Motel Corporation v. Commissioner,54 T.C. 1433 (1970). The petitioner has the burden of proving that such a debtor-creditor relationship was established. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). The courts have relied upon numerous criteria in determining whether purported indebtedness is, in fact, genuine debt or an investment of equity capital. The weight to be accorded each criterion depends upon the facts and circumstances of the particular case. The John Kelley Co. v. Commissioner,326 U.S. 521 (1946); Fin Hay Realty Co. v. United States,398 F.2d 694 (3rd Cir. 1968); *792 John Town, Inc. v. Commissioner,46 T.C. 107, 127 (1966), affd. in an unreported opinion (7th Cir. 1967).The criteria usually considered by the courts include: (1) the intent of the parties at the time of making the advances; (2) the identity of interest between creditors and shareholders; (3) the extent of participation in management by the promissory note holder; (4) the ability of the corporation to obtain funds from outside sources; (5) the right of the creditor to enforce payment of principal and interest; (6) the capital structure in relation to debt; (7) the formal indicia of the arrangement, i.e., whether evidences of indebtedness were issued; (8) the presence or absence of a maturity date and fixed rate of interest; (9) the relative position of the obligee as to other creditors' rights to share in the corporate assets in the event of dissolution or liquidation; (10) the voting power of the obligee; (11) a contingency on the obligation to repay; (12) the source of the interest payments; (13) the provision for redemption by the corporation; (14) the provision for redemption at the option of the obligee; (15) the timing of the advance with reference to the organization *793 of the corporation. Fin Hay Realty Company v. United States,supra at 696; Gilbert v. Commissioner,248 F.2d 399 (2nd Cir. 1957), remanding T.C. Memo 1956-137, on remand T.C. Memo 1958-8, affd. 262 F.2d 512 (2nd Cir. 1959); United States v. Title Guarantee and Trust Company,133 F.2d 990 (6th Cir. 1943); O. H. Kruse Grain and Milling v. Commissioner,279 F.2d 123 (9th Cir. 1960), affg. a Memorandum Opinion of this Court. This Court utilizes the foregoing criteria to assist in the resolution of the ultimate question: whether, as a matter of economic reality, an advance had been placed at the risk of the corporation's successes or losses, thus constituting equity capital, or had been made with the reasonable expectation of reimbursement regardless of the economic fortunes of the business, thus representing a debtor-creditor relationship. Fin Hay Realty Company v. United States,supra at 697; Gilbert v. Commissioner,supra at 406; *794 Yale Avenue Corporation v. Commissioner,58 T.C. 1062 (1972). After considering all of the evidence in the instant case, we are convinced that the incorporating shareholders advanced the funds to petitioner-corporation with the intention of subjecting their moneys to the economic fortunes or misfortunes of the corporate venture. The evidence clearly establishes that by the time Broyles and Lamons advanced the funds in 1968, petitioner had a history of financial difficulties. From 1964 through 1968, petitioner sustained operating losses annually.By fiscal yearend 1968, petitioner's cumulative deficit was approximately $85,000. By petitioner's admission, this reflection of its persistently weak financial position, caused by high construction costs and operating expenses and by relatively low rental income, negatively influenced petitioner's ability to obtain loans from outside sources. After pursuing potential outside financiers, petitioner often resorted to seeking funds from its shareholders. For example, because petitioner's 1965 construction loan did not cover all shopping center construction costs, it was forced to search for additional funds. These funds *795 were not quickly obtainable and petitioner was instead required to make various financial arrangements with construction creditors in order to meet their demands for payment. Subsequently, petitioner obtained permanent financing from Commonwealth Life Insurance Company in January 1967, but this money proved to be insufficient to satisfy all of petitioner's monetary needs. Petitioner was unable to raise substantial working capital from financial institutions. In fact, one existing creditor threatened foreclosure and another exercised its rights to collect the rents from the shopping center's tenants. Consequently, Broyles and Lamons made the 1968 advances. We are of the opinion that these circumstances indicate that Broyles' and Lamons' advances were indispensable to petitioner's financial survival, that petitioner's financial condition looked bleak, and that the parties intended to subject the advances to petitioner's economic fortunes or misfortunes. Petitioner argues that Broyles and Lamons advanced the money with the expectation that petitioner would eventually be able to obtain a long-term loan which would be sufficient to repay the advances.as stated by the Court in *796 Fin Hay Realty Company v. United States,supra at 697, the subjectively stated intention of the parties is not controlling; in essence, the economic reality test is an objective standard, and "it is useful to compare the form which a similar transaction would have taken had it been between the corporation and an outside lender, and if the shareholder's advance is far more speculative than what an outsider would make, it is obviously a loan in name only." (Emphasis added). A review of the form of the transactions indicates that the advances were not genuine loans. A bona fide debt, negotiated at arm's-length, is classically "an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof." Gilbert v. Commissioner,supra at 402. The certainty of the payment of principal and interest is one of the most important factors to be utilized *797 in judging the true nature of advances. Gooding Amusement Company v. Commissioner,supra at 23 T.C. 408, 418-419; Commissioner v. J.N. Bray Company,126 F.2d 612 (5th Cir. 1942), affg. a Memorandum Opinion of this Court. Utilizing this factor to judge the true substance of the advances in question, we are of the opinion that the repayment of principal and interest amounts was uncertain and was dependent upon petitioner's financial condition. For example, the record reveals that in June 1968, petitioner issued non-interest-bearing promissory notes to Broyles and Lamons in amounts totaling $222,666.79. Although the notes had maturity dates of June 1969, upon their expiration petitioner failed to pay the principal and interest amounts owed to the shareholders. At this time, petitioner was illiquid and had a cumulative deficit of $88,296. It was not until June 1971, that petitioner's board of directors dealt with petitioner's lapsed "liability" to its shareholders. The board of directors decided to issue new promissory notes to the shareholders in amounts equal to the previously unpaid principal plus several years of accrued interest. *798 A third deed of trust on petitioner's shopping center property secured the renewal promissory notes. Another series of renewal notes was issued in July 1976. Thus, it appears that Broyles and Lamons were without the intent or effective power to enforce timely repayment of the principal and interest amounts, especially since to do so may have either impaired petitioner's credit rating or brought about its demise. This destroys a basic attribute of creditor status - the power to demand payment at a fixed maturity date. P.M. Finance Corporation v. Commissioner,302 F.2d 786 (3rd Cir. 1962), affg. a Memorandum Opinion of this Court. It is also significant that the promissory notes in question were subordinated to other debt of petitioner.Debt may still be debt despite the presence of subordination, but when the right to share corporate assets with general creditors in the event of corporate dissolution of liquidation is truly nonexistent from the purported loan's origination, a *799 characteristic of the debtor-creditor relationship is missing. John Wanamaker, Philadelphia v. Commissioner,supra at 789-790. In the instant case, the promissory notes, originally issued in 1968, were unsecured. The renewal notes, issued to the shareholders in June 1971, were subordinated to both the $785,000 debt owed to the permanent financier, Commonwealth Life Insurance Company, and to approximately $500,000 of new shareholder advances. The weak financial condition of petitioner from 1968 to 1971 makes it difficult for us to believe that Broyles and Lamons might have expected to share as general creditors if petitioner were to face impending demise. It appears that Broyles and Lamons might have faced a substantial risk of loss. Another aspect of the instant case is the identity of interest between the shareholders and the note holders. While the 1968 advances were not made in strict proportion to Broyles' and Lamons' stock holdings, pursuant to the structure of the 1971 capital stock sales transactions, each new and old shareholder became a holder of petitioner's promissory notes (originally issued with respect to Broyles' and Lamons' advances) in the proportion *800 that mirrored his stock holdings in petitioner. This proportionality serves to strengthen the conclusion that in reality the advances were contributions to capital. Since we find that petitioner's purported liability was not genuine indebtedness for tax purposes, the deductions for accrued interest and net operating losses will be disallowed. Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
2. The record does not indicate the amount of Broyles' and Lamons' 1963 capital contributions.↩
3. If Broyles and Lamons had made capital contributions to petitioner-corporation in amounts equal to the par value of the stock issued to them, petitioner's capital stock account would have totaled $10,000. However, the downpayments on the two properties purchased in July and in August of 1963 totaled $11,425. The record does not indicate whether petitioner obtained loans from its shareholders or outside sources during 1963, or whether the shareholders' capital contributions exceeded a total of $10,000.↩
4. The record does not indicate the purchase date and price of the previously acquired real estate, nor does the record indicate the fair market value of this property on the date that the realty was exchanged for petitioner's capital stock.↩
5. Petitioner's shareholders attribute their lack of success in obtaining permanent financing to construction cost overruns and to their inability to obtain rental commitments from prospective shopping center tenants.↩
6. Broyles-Milner, Inc., is a corporation the capital stock of which is owned by Broyles and his sister.↩
7. Petitioner-corporation's outstanding capital stock as of June 30, 1969, totaled 2,293 shares, of which 812.5 shares were owned by Broyles, 334 shares were owned by Lamons, and 1,146.5 shares were owned by Bewley and his three children. ↩
8. In each 1969 stock purchase transaction, the five new shareholders paid less than par value for the capital stock and received a portion of petitioner's outstanding promissory notes.↩
9. The deficit for 1969 is cumulative from the operating losses sustained during petitioner's fiscal years 1964 through 1969. For years prior to 1969, petitioner realized losses in the following amounts: 1964 - $1,212; 1965 - $19,991; 1966 - $17,757; 1967 - $17,306; 1968 - $29,427.↩
10. Income from discharge of indebtedness. ↩
11. Deficit July 1, 1975 ($29,252.83); Add: Interest on Notes ($154,519.88); Less: Refunds resulting from carryback of interest $4,347.61. ↩
12. Interest deduction.↩
13. Prior to 1976, these interest amounts had not been accrued and charged to petitioner's retained earnings on its financial books. In the preparation of petitioner's 1976 income tax return the accountant determined that petitioner would realize a profit on which Federal income tax would be owed unless a deduction could be taken to offset the profit. At that time, the accountant suggested that petitioner accrue the interest amounts and claim interest expense and net operating loss deductions.↩